**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, and MARGARET SATTERTHWAITE, | |
| Plaintiffs, | Case No. 18-cv-659 |
| v. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| UNITED STATES DEPARTMENT OF STATE, and | Freedom of Information Act, 5 U.S.C. § 552 |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, | |
| Defendants. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     This is an action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, seeking agency records of the determination to terminate Temporary Protected Status (TPS) for Haitian nationals. Timely disclosure of these records is critically important because of the looming termination of legal immigration status for tens of thousands of Haitian nationals living in the United States. The documents sought through this request will shed light on the legality of the termination, the reasons for the termination, the adequacy of the review of relevant conditions and the need for immediate action to reverse or otherwise ameliorate that decision.

2.     TPS is a status under the Immigration and Nationality Act (INA) that provides access to employment authorization and protection from deportation. TPS requires two steps:

first, the country must be designated as warranting TPS due to specific statutory conditions; second, nationals of that country must apply for TPS and demonstrate eligibility, including a demonstration that they do not have disqualifying criminal convictions. Once a country is designated for TPS, the Secretary of Homeland Security ("Secretary") does not have the discretion to terminate that status. Instead, the statute requires a factual inquiry, including consultation with other government agencies, into the conditions that warranted TPS and requires that TPS be continued unless the factual record warrants termination.

3.      The Secretary of Homeland Security designated Haiti for TPS in 2010 after a 7.0 magnitude earthquake struck the island, and redesignated Haiti in 2011 due to conditions post-dating the earthquake, including a deadly cholera epidemic.  Haiti's conditions were reviewed in October 2012 (79 FR 59943), March 2014 (79 FR 1808) and August 2015 (80 FR 51582). Each time, the Secretary of Homeland Security made findings about the conditions on the ground and concluded that they warranted continued provision of TPS.

4.      In May 2017, Secretary of Homeland Security John Kelly extended TPS for six months, with findings including extensive damage and fatalities caused by Hurricane Matthew in October 2016 and heavy rains and flooding in April 2017, which together compounded existing food insecurity on the island. *See* 82 FR 23830. Despite his finding that conditions warranted an extension of TPS, Secretary Kelly stated in the Federal Register that Haitian nationals with TPS were "encouraged to prepare for their return to Haiti, including requesting updated travel documents from the Government of Haiti."  In testimony before Congress, Secretary Kelly stated that the six month extension was meant as an "alert" and that TPS had been granted for "a specific event – the earthquake," with no mention of the post-earthquake conditions that had led to the redesignation of TPS in 2011 or the three prior extensions of TPS.  The Secretary further

testified that he would like to see the situation for TPS recipients solved "in some other way." Senate Homeland Hearing on the Department of Homeland Security Budget, Fiscal Year 2018, June 6, 2017.

5.      On or about October 31, 2017, Secretary of State Rex Tillerson transmitted the findings of the Department of State (DOS) to the Department of Homeland Security (DHS) addressing whether the conditions in Haiti warranted extension or termination of TPS for Haitian nationals.

6.      On November 20, 2017, Acting Secretary of Homeland Security Elaine Duke issued a press release stating that she had terminated TPS.  Her statement did not discuss most of the conditions that had led to extension in May of 2017.[1] No notice was placed in the Federal Register until January 18, 2018, at which point one sentence was added noting the cholera epidemic, but offering no analysis of its reach other than to say that it was "at its lowest level."

7.      As a result of the decision to terminate TPS, 58,000 Haitian nationals who have lived in the United States since at least 2011 face loss of their right to remain in the United States and to obtain employment authorization. These TPS recipients are parents to approximately 27,000 U.S.-citizen children, who face total disruption of their lives if their parents lose their ability to remain in the United States.[2]

8.      Plaintiffs, the National Immigration Project of the National Lawyers Guild (NIPNLG) and Professor Margaret Satterthwaite (collectively, "Plaintiffs") bring this action to

---

[1] DHS Press Release, "Acting Secretary Elaine Duke Announcement on Temporary Protected Status for Haiti (Nov. 20, 2017) ("DHS Press Release") available at https://www.dhs.gov/news/2017/11/20/acting-secretary-elaine-duke-announcement-temporary-protected-status-haiti.
[2] Donald Kerwin and Robert Warren, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras and Haiti*, JOURNAL ON MIGRATION AND HUMAN SECURITY (August 2017) http://cmsny.org/publications/jmhs-tps-elsalvador-honduras-haiti/.

obtain undisclosed government records regarding the facts and standard applied by the agency in its termination of TPS for nationals of Haiti.

9.      Plaintiffs submitted two FOIA requests seeking records relating to the DHS's non-discretionary determination to terminate TPS for nationals of Haiti. The first, short-form request was addressed to Defendant DHS, and the second, long-form request was addressed to Defendants DHS, Department of State (DOS), Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS). Plaintiffs are entitled to the timely release of records responsive to the requests.

10.     The records Plaintiffs seek would contribute to a much greater understanding of the relevant conditions undergirding the termination of TPS for Haiti. Specifically, the records will reveal the extent to which Defendants cabined their evaluation of conditions to those immediately caused by the January 2010 earthquake that struck Haiti, or whether subsequent conditions that impeded earthquake recovery including the cholera epidemic, Hurricane Matthew in 2016 and heavy rains and flooding in 2017, were part of Defendants' determination. Moreover, the records will help clarify the extent to which the determination to terminate TPS involved a changed legal standard and / or policy considerations and the improper consideration of factors unrelated to extraordinary and temporary conditions in Haiti that prevent Haitian nationals from returning to Haiti in safety.

11.     To date, Defendants have produced no records in response to Plaintiffs' FOIA requests.

12.     Defendants' failure to respond to Plaintiffs' requests violates FOIA. Plaintiffs seek an order requiring Defendants to produce, and enjoining Defendants from withholding, records responsive to the requests.

**JURISDICTION AND VENUE**

13.     This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B) because one of the Plaintiffs, Professor Margaret Satterthwaite, has her principal place of business within this District. Venue is proper under 5 U.S.C. § 552(a)(4)(B).

**PARTIES**

14.     Plaintiff NIPNLG is a national, nonprofit organization dedicated to providing legal assistance and support to immigrant communities and advocating on behalf of noncitizens. Its principal place of business is located at 14 Beacon Street, Suite 602, Boston, MA 02108. Members and supporters of NIPNLG include attorneys, legal workers, law students, judges, jailhouse lawyers, grassroots advocates, community organizations, and others seeking to defend and expand the rights of immigrants in the United States. NIPNLG is primarily engaged in disseminating information to the public. It is the author of four treatises on immigration law published by Thomson Reuters. NIPNLG provides technical and litigation assistance, participates in impact litigation, advocates for fair and just policies and legislation, provides legal training to the bar and the bench, and regularly publishes practice advisories and community resources on immigration law topics that are disseminated to its members and a large public audience through its website, www.nationalimmigrationproject.org.

15.     Plaintiff Margaret Satterthwaite is a clinical law professor at the New York University (NYU) School of Law. She directs a human rights clinic and conducts academic and applied research related to human rights issues. A significant strand of her ongoing clinical work and academic research relates to Haiti and Haitian immigrants in the United States. Her research is frequently published in open-access and academic settings. She has authored or co-authored numerous articles and reports concerning human rights conditions in Haiti, including two reports

5

about post-earthquake sexual violence and exploitation in displacement camps. She travels to Haiti several times per year. Professor Satterthwaite's principal place of business is located at NYU School of Law, 245 Sullivan Street, New York, NY 10012.

16.    Defendant Department of Homeland Security (DHS) is a department within the executive branch of the United States government. It is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). DHS is headquartered in Washington, DC, and has field offices in New York, NY. Upon information and belief, DHS has possession, custody, and control over the records Plaintiffs seek.

17.    Defendant Department of State (DOS) is a department within the executive branch of the United States government. It is an "agency" within the meaning of 5 U.S.C. § 552(f)(1) and is headquartered in Washington, DC. Upon information and belief, DOS has possession, custody, and control over the records Plaintiffs seek.

18.    Defendant Immigration and Customs Enforcement (ICE) is a component agency of DHS. It also is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). ICE is headquartered in Washington, DC, and has field offices in New York, NY. Upon information and belief, ICE has possession, custody, and control over the records Plaintiffs seek.

**STATEMENT OF FACTS**

**Background of TPS Designation and Termination for Haiti**

19.    Under 8 U.S.C. § 1254a(b)(1), the Secretary of Homeland Security (Secretary) is authorized to designate a foreign state for TPS upon a finding that such state is experiencing ongoing armed conflict, an environmental disaster, or "extraordinary and temporary conditions."

20.    During the period for which the Secretary has designated a country for TPS, TPS beneficiaries are eligible to remain in the United States and may obtain work authorization. 8

U.S.C. § 1254a(a)(1).

21.    At least sixty days before the end of the period of the TPS designation, the Secretary, in consultation with the other agencies, must review the conditions in the foreign state. 8 U.S.C. § 1254a (b)(3)(A). Unless the Secretary determines that a foreign state no longer meets the conditions for which a designation is in effect, the period of designation is automatically extended for an additional period of at least six months. 8 U.S.C. § 1254a(b)(3)(C).

22.    On January 21, 2010, after consulting with the DOS and other government agencies, Secretary Janet Napolitano designated Haiti for TPS for a period of 18 months because she determined that there existed in Haiti "extraordinary and temporary conditions" preventing Haitian nationals from returning to Haiti in safety. 75 FR 3476 (Jan. 21, 2010).

23.    At that time, the "extraordinary and temporary conditions" were a result of a 7.0 magnitude earthquake that occurred on January 12, 2010. *Id.* at 3477.

24.    The earthquake destroyed most of Haiti's capital city, Port-au-Prince, and killed more than 200,000 people.[3] More than 2.3 million people were displaced, and many more were affected by the emergency conditions caused by the earthquake.[4] Hospitals overflowed with victims, electricity was cut off, potable water was hard to find, and telephone service was severely affected. Food and medicine were scarce. Roads blocked with debris made it difficult to transport food, clean water, and medical supplies. 75 FR 3476, 3477.

---

[3] U.N. OFFICE FOR THE COORDINATION OF HUMANITARIAN AFFAIRS (U.N. OCHA), *Haiti: One Year Later* (Jan. 18, 2011) http://www.unocha.org/issues-indepth/haiti-one-year-later.

[4] The earthquake destroyed more than 300,000 homes, U.N. OFFICE OF THE SECRETARY-GENERAL'S SPECIAL ADVISER ON COMMUNITY-BASED MEDICINE & LESSONS FROM HAITI, *Lessons from Haiti: Key Statistics* (2012) [hereinafter *Lessons*], http://www.lessonsfromhaiti.org/ lessons-from-haiti/key-statistics/#section-two; killed 20% of civil servants, INTERIM HAITI RECOVERY COMMISSION, Haiti One Year Later: The Progress to Date an d the Path Forward 3 (2011) [hereinafter *One Year Later*], http://www.lessonsfromhaiti.org/download/Report_Center/IHRC_Haiti_One_Year_Later_EN__original.p df; and contributed to public health emergencies, including a cholera epidemic.

25.    The initial TPS designation was effective through July 22, 2011. *Id.* at 3476.

26.    In October 2010, one of the deadliest cholera outbreaks in modern history erupted in Haiti, overwhelming the nation's public health system. Cholera, which continues to sicken Haitians today, is a stand-alone disaster, adding to and exacerbating the damage caused by the earthquake.[5]

27.    On May 19, 2011, Secretary Napolitano both extended the existing TPS designation for Haiti *and* re-designated Haiti for TPS in order to "allow[] additional individuals . . . to obtain TPS . . . including certain Haitians who arrived in the United States following the January 12, 2010 earthquake in Haiti." 76 FR 29000 (May 19, 2011).

28.    Secretary Napolitano cited the fact that the earthquake had "exacerbated Haiti's position as the least-developed country in the Western Hemisphere and one of the poorest in the world," where 80 percent of the population lived below the poverty line, and per capita gross domestic product was under $2 per day. She specifically noted that the cholera outbreak in Haiti evidenced the vulnerability of the public health sector, citing 199,497 cholera cases since the earthquake, including 112,656 hospitalizations and 3,297 deaths. *Id.* at 29001.

29.    This 18-month TPS extension and re-designation were effective through January 22, 2013. *Id.* at 29000.

30.    TPS was extended for Haitian nationals for 18-month intervals again in October 2012, March 2014, and August 2015. For each extension, the DHS outlined conditions arising from the January 12, 2010 earthquake in Haiti and its attendant damage to infrastructure, public health, agriculture, transportation and educational facilities. Each subsequent extension named

---

[5] *See* Global Justice Clinic, *Extraordinary Conditions: A Statutory Analysis of Haiti's Qualifications for TPS* (Oct. 2017) at 8 ("GJC report") available at http://chrgj.org/wp-content/uploads/2017/10/171025_Global-Justice-Clinic-Haiti-TPS-Report-web-version.pdf.

the cholera epidemic and the exacerbation of pre-existing vulnerabilities caused by the earthquake, including food insecurity and a housing crisis, as contributing to the extension of TPS for Haitian nationals.

31.     In December 2016, in advance of the expiration of the August 2015 extension of TPS for Haitian nationals, Secretary of State John F. Kerry issued a letter to Secretary of Homeland Security Jeh Johnson which outlined the extraordinary and temporary conditions that made Haiti unsafe for the return of nearly 60,000 Haitian nationals and recommended that Secretary Johnson extend TPS for Haiti upon its expiration on July 22, 2017.[6]

32.     On April 10, 2017, Acting Director of USCIS James W. McCament issued a memo regarding the Haitian TPS extension in which he recommended termination of TPS.[7] Despite this recommendation, the memo stated:

> Haiti's weak public health system is further strained by an ongoing cholera epidemic, whose inception was traced to U.N. peacekeepers assisting with earthquake recovery. Since October 2010, close to 800,000 Haitians have contracted cholera, and nearly 10,000 people have died from the disease.

33.     The memo also stated that 40 percent of the Haitian population lacked access to fundamental health and nutrition services.[8]

34.     In April and May 2017, upon information and belief, USCIS officials asked the agency to compile evidence on any crimes committed and public benefits used by Haitians with

---

[6] Letter from Secretary of State John F. Kerry to Secretary of Homeland Security Jeh Johnson (December 12, 2016), http://www.ijdh.org/wp-content/uploads/2016/10/Haiti_TPS_StateDept-Dec2016-HaitiMemo.pdf [hereinafter *Letter to the Honorable Jeh Johnson*] (requesting an extension of TPS for Haiti).

[7] Memo from James W. McCament to the Secretary of Homeland Security, "Haiti's Designation for Temporary Protected Status," (Apr. 10, 2017) ("McCament memo") available at https://www.lexisnexis.com/legalnewsroom/immigration/b/newsheadlines/archive/2017/04/21/uscis-recommendation-to-terminate-tps-for-haiti-apr-10-2017.aspx.

[8] *Id.*

TPS.[9]

35.    On May 24, 2017, Secretary John F. Kelly once again extended TPS for Haiti. 82 FR 23830 (May 24, 2017). This 6-month extension was effective through January 22, 2018. *Id.*

36.    In his designation notice, Secretary Kelly documented a number of country conditions that continued to prevent Haitian nationals from returning to Haiti in safety, including the "ongoing cholera epidemic," stating that since October 2010, close to 800,000 Haitians had contracted cholera, and nearly 10,000 people had died of the disease. *Id.* at 23832.

37.    Secretary Kelly presented the fact that Hurricane Matthew, which made landfall on October 4, 2016, caused 546 fatalities and left over 175,000 people without housing, as well as causing "extensive damage to crops, housing, livestock, and infrastructure" across Haiti. *Id.* at 23832. Further, Secretary Kelly noted that approximately 3.2 million people faced food insecurity.  *Id.* at 23832.

38.    Though Kelly found that 96% of people had moved out of IDP camps, he noted that 55,000 people continued to live in IDP camps, where they remained vulnerable to gender based violence and other security risks.  *Id.*

39.    Kelly acknowledged that many camp residents may have moved back to unsafe conditions.  "Some people who were displaced by the earthquake, although no longer in camps, have moved back to unsafe homes or relocated to informal settlements located in hazardous areas."  *Id.* at 23823.

40.    Despite Secretary Kelly's finding that conditions warranted an extension of TPS, he advised Haitian nationals to prepare to return to Haiti and made public statements that the short, 6-month extension was meant to be an "alert." He also attributed past extensions to

---

[9] Alicia A. Caldwell, "AP Exclusive: U.S. Digs for Evidence of Haiti Immigrant Crimes," A.P. NEWS, May 9, 2017 available at https://apnews.com/740ed5b40ce84bb398c82c48884be616.

"automatic renewals."

41.    On or about October 31, 2017, Secretary of State Rex Tillerson sent a letter to DHS Acting Secretary Elaine Duke, recommending that conditions in Haiti no longer justify its TPS designation.[10] Unlike Secretary Kerry's letter from December of 2016, Secretary Tillerson's letter has not been made available to the public, and it is a document sought by the instant FOIA request.

42.    On November 20, 2017, Acting Secretary Duke announced her decision to terminate the TPS designation for Haiti with a delayed effective date of 18 months.[11]

43.    Acting Secretary Duke stated that the "extraordinary but temporary conditions relating to the 2010 earthquake that prevented Haitian nationals from returning in safety—are no longer met."[12]

44.    This determination was made although the conditions and challenges arising from the earthquake have not substantially changed since Secretary Kelly's extension determination on May 24, 2017.

45.    Unlike her predecessors, Duke did not meaningfully address the ongoing cholera epidemic, the effects of Hurricane Matthew, the housing crisis, the ongoing presence of internally displaced people, and other conditions cited in earlier extensions and the re-designation.

46.    Instead of examining all of the conditions that had supported earlier extensions

---

[10] *See* Nick Miroff and Karen DeYoung, "Protected Status No Longer Justified for Central Americans and Haitians in U.S., State Dept. says," WASHINGTON POST, November 3, 2017, available at https://www.washingtonpost.com/world/central-americans-and-haitians-no-longer-need-protected-status-state-dept-says/2017/11/03/647cbd5c-c0ba-11e7-959c-fe2b598d8c00_story.html?utm_term=.4e2a260d7f51.

[11] DHS Press release, *supra* n. 1.

[12] *Id.*

and the TPS re-designation, Secretary Duke stated that the IDP population had decreased and that the United Nations had withdrew its peacekeeping mission.  Secretary Duke noted that a new president is in office, and that he intends to rebuild the National Palace.  Last, Secretary Duke stated that Haiti's economy has been recovering since the earthquake.[13]

47.    A Federal Register Notice of the termination of TPS was delayed until January 18, 2018.  83 FR 2468.  At this time, there are approximately 58,700 beneficiaries of Haitian TPS[14] who are currently required to leave the country on or before July 22, 2019.

48.    On January 10, 2018, more than a week before the publication of the Federal Register notice for Haiti, the State Department issued a travel advisory for Haiti.  The alert designated Haiti as level 3: *Reconsider Travel.*[15]  The alert noted that violent crime and armed robbery are common.  *Id.*

49.    In September of 2017, the State Department issued a travel advisory for Haiti that stated that the rates of kidnapping, murder, and rape rose in 2016.[16]

50.    Reviews of country conditions in Haiti made in the weeks prior to the November 20, 2017 decision to terminate TPS suggest that the extraordinary and temporary conditions for which Haiti was designated for TPS in 2010 and redesignated for TPS in 2011 remain.  The conditions include:

(i)    internal displacement: More than 37,000 people remain in IDP camps, with tens of thousands more displaced but not recorded in official statistics due to lack of

---

[13] *Id.*

[14] McCament memo, *supra* n.7, at 2.

[15] https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Haiti.html

[16] https://ht.usembassy.gov/haiti-travel-warning/

tracking or reclassification;[17]

(ii) a housing and physical infrastructure crisis that demonstrates that many people who left camps settled in equally inadequate homes, many of which were damaged by the earthquake;[18]

(iii) one of the world's worst cholera epidemics;[19]

(iv) grave hunger and malnutrition, with more than one million people facing severe, acute food insecurity;[20]

(v) political instability and security risks, including the risk of gender based violence.[21] The United Nations Peacekeeping force played an important role in stabilizing Haiti. Its replacement with a smaller force has generated concern that Haiti lacks necessary police presence. Nearly one quarter of police supervisory positions remain unfilled, and the police have a presence in fewer than half of Haiti's 570 communal sections;[22] and

(vi) a widening fiscal deficit, with economic growth slowing to one percent and public expenditures on the rise to meet post-Matthew reconstruction needs.[23]

51. The records sought through the FOIA requests will show what standard was

---

[17] U.N. OCHA, Haiti: Humanitarian Snapshot (Aug. 2017)

[18] REFUGEES INTERNATIONAL, TWO STEPS BACK: HAITI STILL REELING FROM HURRICANE MATTHEW 13 (2017), https://www.refugeesinternational.org/reports/2017/4/6/haiti.

[19] U.N. OCHA, *Haiti: Humanitarian Snapshot* (November 2017), https://www.humanitarianresponse.info/system/files/documents/files/hti_humanitarian_snapshot_november2017-en.pdf.

[20] *Id.*

[21] REFUGEES INTERNATIONAL, TWO STEPS BACK: HAITI STILL REELING FROM HURRICANE MATTHEW 5 (2017), https://www.refugeesinternational.org/reports/2017/4/6/haiti.

[22] U.N. Secretary-General, Report of the Secretary-General on the United Nations Stabilization Mission in Haiti, ¶ 39, U.N. Doc. S/2016/753 (Aug. 31, 2016).

[23] THE WORLD BANK, *Haiti: Overview*, http://www.worldbank.org/en/country/haiti/overview (October 2017).

applied to evaluate the conditions in Haiti and the actual conditions that were and were not considered in the finding that TPS should be terminated.

**Plaintiffs' First FOIA Request**

52.    On November 22, 2017, following Acting Secretary of Homeland Security Duke's announcement to terminate the TPS designation for Haiti, Plaintiffs submitted a FOIA request (Request I) to Defendant DHS. (See Exhibit 1). The Request sought the following documents, none of which are presently in the public domain:

1. "All records sent by or to Elaine Duke, Acting Director of the DHS, relating to TPS for nationals of Haiti, including but not limited to the extension, redesignation, or termination of TPS for Haitian nationals; and

2. All records relating to and including a letter dated on or about October 31, 2017 from Secretary of State Rex Tillerson to Elaine Duke, Acting Director of Department of Homeland Security, informing her that conditions in Haiti no longer justify its TPS designation."

53.    Plaintiffs sought "expedited processing" under 5 U.S.C. § 552(a)(6)(E)(i) and a full fee waiver pursuant to both 5 U.S.C. § 552(a)(4)(A)(iii) and  6 C.F.R. § 5.11(k)(1) (public interest waivers).

54.    By email dated November 28, 2017, DHS acknowledged receipt of Request I and informed Plaintiffs that DHS had "determined that item one of [Plaintiffs'] request is too broad in scope." (See Exhibit 2). DHS instructed Plaintiffs to "resubmit [their] request with a time period for item 1." DHS also noted that the agency would consider Plaintiffs to be "no longer interested" and would "administratively close[]" Plaintiffs' request if DHS did not receive a response within 30 days of the date of the email.

55.    By email sent December 1, 2017, Plaintiffs responded to DHS's November 28, 2017 email. (See Exhibit 3).  Plaintiffs notified DHS that Plaintiffs remained interested in the

FOIA request and that the case should not be administratively closed. Plaintiffs further specified that with regard to item one, they "seek records between April 4, 2017 and November 22, 2017."

56.    To date, Plaintiffs have not received any additional communications from DHS regarding Request I.

57.    More than 20 working days have passed since DHS received Request I and since Plaintiffs perfected their request, and DHS has not yet responded.

**Plaintiffs' Second FOIA Request**

58.    On November 24, 2017, Plaintiffs submitted a second and longer FOIA request (Request II) to DHS, ICE, DOS, and USCIS. (See Exhibit 4). The Request sought the following documents:

1. "All records relating to any recommendation made by any employee of the DHS, USCIS, ICE, or DOS for the extension or redesignation of TPS for nationals of Haiti since January 20, 2017;

2. All records relating to any recommendation made by any employee of USCIS, DHS, ICE, or DOS for the termination of TPS for nationals of Haiti since January 20, 2017;

3. All records relating to correspondence and/or communications between any employee of USCIS, DHS, or ICE and any employee of DOS regarding TPS for nationals of Haiti since January 20, 2017;

4. All records relating to any recommendation made by any persons tasked with developing TPS policy or directives from the White House to any employee of USCIS, DHS, ICE, or DOS regarding the termination of TPS for nationals of Haiti since January 20, 2017;

5. All other records relating to correspondence and/or communications between any employee of USCIS, DHS, ICE, or DOS and any White House personnel regarding TPS for nationals of Haiti since January 20, 2017;

6. All records relating to correspondence and/or communications from President Trump's Cabinet to any employee of USCIS, DHS, ICE, or DOS regarding TPS for nationals of Haiti since January 20, 2017;

7. All records relating to correspondence and/or communications from Department of Justice (DOJ) officials to any employee of USCIS, DHS, ICE, or DOS regarding TPS for nationals of Haiti since January 20, 2017;

8. All records pertaining to current country conditions of Haiti, including but not limited to those compiled by United States Agency for International Development (USAID), since November 1, 2016;

9. All records relating to correspondence and/or communications between any employee of USCIS, DHS, ICE, or DOS and Haitian leaders, including but not limited to Haitian Foreign Minister Antonio Rodrigue and Haitian Ambassador Paul Altidor, regarding the extension, redesignation, or termination of TPS for Haitian nationals;

10. All records since January 20, 2017 relating to any inquiry or request made by Kathy Nuebel Kovarik, Chief of USCIS Office of Policy and Strategy, concerning the criminal history of nationals of Haiti with TPS, including any communications and/or correspondence with John Kelly, former Secretary of the DHS and with Elaine Duke, Acting Director of DHS.

11. All records relating to any inquiry or request made by or to any employee of USCIS, DHS, ICE, or DOS concerning the criminal history of nationals of Haiti with TPS, including any communications and/or correspondence with White House personnel and/or DOJ officials;

12. All records relating to any response made by any employee of USCIS, DHS, ICE, or DOS to the inquiries referenced in Requests #10 and 11, including but not limited to any data or information responsive to the inquiry;

13. All records relating to any inquiry or request made by Kathy Nuebel Kovarik, Chief of USCIS Office of Policy and Strategy, concerning whether, when, and how nationals of Haiti with TPS have used any type of public benefit;

14. All records relating to any inquiry or request made by or to any employee of USCIS, DHS, ICE, or DOS concerning whether, when, and how nationals of Haiti with TPS have used any type of public benefit;

15. All records relating to any response made by any employee of USCIS, DHS, ICE, or DOS to the inquiry referenced in Requests #13 and 14, including but not limited to any data or information responsive to the inquiry;

16

16. All records since January 1, 2010 relating to and including previous recommendations and standards to extend and redesignate TPS for the nationals of Haiti;

17. All records relating to any policy, guidance, directives, and/or memoranda issued since January 1, 2010 pertaining to the country conditions in Haiti and the use of this information in the determination of designating, redesignating, extending, or terminating TPS for the nationals of Haiti;

18. All records relating to the number of Haitian nationals with TPS who are employed by small businesses, small non-profit organizations, and small jurisdictions of government; and

19. All records relating to any analysis of the potential economic impacts on small businesses, small non-profit organizations, and small jurisdictions of government of the termination of TPS for nationals of Haiti."

59.    Plaintiffs sought "expedited processing" under 5 U.S.C. § 552(a)(6)(e)(i) and a full fee waiver pursuant to both 5 U.S.C. § 552(a)(4)(A)(iii) and 6 C.F.R. § 5.11(k)(1) (public interest waivers).

60.    By email dated November 29, 2017, DHS acknowledged receipt of Request II and informed Plaintiffs that DHS had "determined that [Plaintiffs'] request is too broad in scope or did not specifically identify the records which [Plaintiffs] are seeking." (See Exhibit 5). DHS instructed Plaintiffs to "resubmit [their] request containing a reasonable description of the records [Plaintiffs] are seeking." DHS further notified Plaintiffs that it would consider Plaintiffs to be "no longer interested" and would "administratively close[]" Plaintiffs' requests if DHS did not receive a response within 30 days of the date of the email.

61.    By email sent December 4, 2017, Plaintiffs responded to DHS's November 28, 2017 email. (See Exhibit 6). Plaintiffs notified DHS that Plaintiffs remained interested in the

FOIA request and that the case should not be administratively closed. Plaintiffs further agreed to

narrow fifteen of the nineteen requests as follows:

Item three asks for "all records relating to correspondence and/or communications between any employee of USCIS, DHS, or ICE and any employee of DOS regarding TPS for nationals of Haiti since January 20, 2017."  We narrow our request to "*all correspondence and/or communications between any employee of USCIS, DHS, or ICE and any employee of DOS regarding TPS for nationals of Haiti since January 20, 2017.*"

Item five asks for "all other records relating to correspondence and/or communications between any employee of USCIS, DHS, ICE, or DOS and any White House personnel regarding TPS for nationals of Haiti since January 20, 2017." We narrow our request to "*all correspondence and/or communications between any employee of USCIS, DHS, ICE, or DOS and any White House personnel regarding TPS for nationals of Haiti since January 20, 2017.*"

Item six asks for "all records relating to correspondence and/or communications from President Trump's Cabinet to any employee of USCIS, DHS, ICE, or DOS regarding TPS for nationals of Haiti since January 20, 2017." We narrow our request to "*all correspondence and/or communications from President Trump's Cabinet to any employee of USCIS, DHS, ICE, or DOS regarding TPS for nationals of Haiti since January 20, 2017.*"

Item seven asks for "all records relating to correspondence and/or communications from Department of Justice (DOJ) officials to any employee of USCIS, DHS, ICE, or DOS regarding TPS for nationals of Haiti since January 20, 2017." We narrow our request to "*all correspondence and/or communications from Department of Justice (DOJ) officials to any employee of USCIS, DHS, ICE, or DOS regarding TPS for nationals of Haiti since January 20, 2017.*"

Item eight asks for "all records pertaining to current country conditions of Haiti, including but not limited to those compiled by United States Agency for International Development (USAID), since November 1, 2016." We narrow our request to "*all records reflecting current country conditions in Haiti, including but not limited to those compiled by United States Agency for International Development (USAID), since November 1, 2016.*"

Item nine asks for "all records relating to correspondence and/or communications between any employee of USCIS, DHS, ICE, or DOS

and Haitian leaders, including but not limited to Haitian Foreign Minister Antonio Rodrigue and Haitian Ambassador Paul Altidor, regarding the extension, redesignation, or termination of TPS for Haitian nationals." We narrow our request to "*all correspondence and/or communications between any employee of USCIS, DHS, ICE, or DOS and Haitian leaders, including but not limited to Haitian Foreign Minister Antonio Rodrigue and Haitian Ambassador Paul Altidor, regarding the extension, redesignation, or termination of TPS for Haitian nationals.*"

Item ten asks for "records since January 20, 2017 relating to any inquiry or request made by Kathy Nuebel Kovarik, Chief of USCIS Office of Policy and Strategy, concerning the criminal history of nationals of Haiti with TPS, including any communications and/or correspondence with John Kelly, former Secretary of the DHS and with Elaine Duke, Acting Director of DHS." We narrow our request to "*records since January 20, 2017 reflecting any inquiry or request made by Kathy Nuebel Kovarik, Chief of USCIS Office of Policy and Strategy, concerning the criminal history of nationals of Haiti with TPS, including any communications and/or correspondence with John Kelly, former Secretary of the DHS and with Elaine Duke, Acting Director of DHS.*"

Item eleven asks for "all records relating to any inquiry or request made by or to any employee of USCIS, DHS, ICE, or DOS concerning the criminal history of nationals of Haiti with TPS, including any communications and/or correspondence with White House personnel and/or DOJ officials." We narrow our request to "*records since January 20, 2017, reflecting any inquiry or request made by or to any employee of USCIS, DHS, ICE, or DOS concerning the criminal history of nationals of Haiti with TPS, including any communications and/or correspondence with White House personnel and/or DOJ officials.*"

Item twelve asks for "all records relating to any response made by any employee of USCIS, DHS, ICE, or DOS to the inquiries referenced in Requests #10 and 11, including but not limited to any data or information responsive to the inquiry." We narrow our request to "*any responses made by any employee of USCIS, DHS, ICE, or DOS to the inquiries referenced in Requests #10 and 11.*"

Item thirteen asks for "all records relating to any inquiry or request made by Kathy Nuebel Kovarik, Chief of USCIS Office of Policy and Strategy, concerning whether, when, and how nationals of Haiti with TPS have used any type of public benefit." We narrow our request to "*records reflecting any inquiry or request made by Kathy Nuebel Kovarik, Chief of USCIS Office of Policy and Strategy, concerning whether, when, and how nationals of Haiti with TPS have used any type of public benefit.*"

19

Item fourteen asks for "all records relating to any inquiry or request made by or to any employee of USCIS, DHS, ICE, or DOS concerning whether, when, and how nationals of Haiti with TPS have used any type of public benefit." We narrow our request to "*records since January 20, 2017, reflecting any inquiry or request made by or to any employee of USCIS, DHS, ICE, or DOS concerning whether, when, and how nationals of Haiti with TPS have used any type of public benefit.*"

Item fifteen asks for "all records relating to any response made by any employee of USCIS, DHS, ICE, or DOS to the inquiry referenced in Requests #13 and 14, including but not limited to any data or information responsive to the inquiry." We narrow our request to "*any responses made by any employee of USCIS, DHS, ICE, or DOS to the inquiries referenced in Requests #13 and 14.*"

Item seventeen asks for "all records relating to any policy, guidance, directives, and/or memoranda issued since January 1, 2010 pertaining to the country conditions in Haiti and the use of this information in the determination of designating, redesignating, extending, or terminating TPS for the nationals of Haiti." We narrow our request to "*any policy, guidance, directives, and/or memoranda issued since January 1, 2010 pertaining to the country conditions in Haiti and the use of this information in the determination of designating, redesignating, extending, or terminating TPS for the nationals of Haiti.*"

Item eighteen asks for "all records relating to the number of Haitian nationals with TPS who are employed by small businesses, small non-profit organizations, and small jurisdictions of government." We narrow our request to "*all records reflecting the number of Haitian nationals with TPS who are employed by small businesses, small non-profit organizations, and small jurisdictions of government.*"

Item nineteen asks for "all records relating to any analysis of the potential economic impacts on small businesses, small non-profit organizations, and small jurisdictions of government of the termination of TPS for nationals of Haiti." We narrow our request to "*all records containing any analysis of the potential economic impacts on small businesses, small non-profit organizations, and small jurisdictions of government of the termination of TPS for nationals of Haiti.*"

We add an additional item twenty, through which we seek all communications between January 20, 2017 and May 24, 2017 regarding the May 24, 2017 Federal Register publication justifying the six-month extension of TPS at that time for nationals of Haiti.

20

62.     By email dated November 30, 2017, DOS acknowledged receipt of Request II and informed Plaintiffs that "before [the agency] can begin processing [Plaintiffs'] request, [the agency] ask[s] that [Plaintiffs] narrow the subject." (See Exhibit 6). DOS instructed Plaintiffs to "respond by close of business" the following day and identify specific individuals employed by DOS who may have sent or received the requested communications.

63.     By email sent December 1, 2017, Plaintiffs responded to DOS's November 30, 2017 email. (See Exhibit 7). Plaintiffs notified DOS that Plaintiffs sought communications regarding TPS for Haiti by "DOS personnel who were involved in the assessment of whether to extend TPS for nationals of Haiti," and identified the following officials whose communications should be reviewed:

Rex Tillerson, Secretary of State

John Sullivan, Deputy Secretary of State

Thomas Shannon, Under Secretary of State for Political Affairs

Francisco Palmieri, Deputy Assistant Secretary, Bureau of Western Hemisphere Affairs

Kenneth Merten, Deputy Assistant Secretary, Bureau of Western Hemisphere Affairs and Haiti Special Coordinator

Simon Henshaw, Deputy Assistant Secretary, Bureau of Population, Refugees, and Migration

Randy Berry, Deputy Assistant Secretary, Bureau of Democracy, Human Rights, and Labor

Scott Busby, Deputy Assistant Secretary, Bureau of Democracy, Human Rights, and Labor

Robin Diallo, Chargé d'Affaires, U.S. Embassy in Haiti

Michele Sison, Ambassador to Haiti

64.    By email dated December 12, 2017, ICE acknowledged receipt of Request II, granted Plaintiffs' claim for a fee waiver, denied Plaintiffs' claim for expedited processing, and invoked the ten day extension as allowed under 5 U.S.C. § 552(a)(6)(B). (See Exhibit 8).

65.    To date, Plaintiffs have not received any additional communications from DHS, DOS, or ICE regarding Request II.

66.    More than 20 working days have passed since Defendants DHS, DOS, and ICE received Request II and since Plaintiffs perfected their request, and none of the agencies have yet responded to Request II.

## CAUSE OF ACTION

## COUNT I

### FOIA Violation: Failure To Disclose and Release Responsive Records
### (Against Defendant DHS)

67.    Plaintiffs re-allege and incorporate by reference paragraphs 1–66.

68.    Plaintiffs have exhausted all administrative remedies with respect to Request I under 5 U.S.C. § 552(a)(6)(C)(i).

69.    Plaintiffs have a statutory right under FOIA, 5 U.S.C. § 552(a)(3)(A), to the records they requested, and there is no legal basis for DHS's failure to disclose them.

70.    Upon receiving Plaintiffs' Request I, Defendant DHS was obligated under 5 U.S.C. § 552(a) to promptly conduct a reasonable search for records responsive to Request I and to produce any responsive records.

71.    As of the date of this Complaint and in violation of the deadlines set forth in 5 U.S.C. § 552(a)(6), DHS has failed to disclose and release records in violation of 5 U.S.C. § 552(a).

72.     Defendant DHS has not identified any legal basis for their failure to timely conduct a reasonable search for, and to produce, responsive records.

73.     The failure by DHS to conduct reasonable searches for records responsive to Request I and to produce responsive records violates 5 U.S.C. § 552(a) and the regulations promulgated thereunder.

## COUNT II

### FOIA Violation: Failure To Disclose and Release Responsive Records
### (Against Defendants DHS, DOS, and ICE)

74.     Plaintiffs re-allege and incorporate by reference paragraphs 1–66.

75.     Plaintiffs have exhausted all administrative remedies with respect to Request II under 5 U.S.C. § 552(a)(6)(C)(i).

76.     Plaintiffs have a statutory right under FOIA, 5 U.S.C. § 552(a)(3)(A), to the records they requested, and there is no legal basis for DHS, DOS, or ICE's failure to disclose them.

77.     Upon receiving Plaintiffs' Request II, Defendants were obligated under 5 U.S.C. § 552(a) to promptly conduct a reasonable search for records responsive to Request II and to produce any responsive records.

78.     As of the date of this Complaint and in violation of the deadlines set forth in 5 U.S.C. § 552(a)(6), Defendants have failed to disclose and release records in violation of 5 U.S.C. § 552(a).

79.     Defendants have not identified any legal basis for their failure to timely conduct a reasonable search for, and to produce, responsive records.

80.     The failure by Defendants to conduct reasonable searches for records responsive to Request II and to produce responsive records violates 5 U.S.C. § 552(a) and the regulations promulgated thereunder.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(1) Declare that Defendants' withholding of the requested records is unlawful;

(2) Order Defendants to immediately conduct a full, adequate, and expedited search and make available all records responsive to the Requests;

(3) Enjoin the Defendants from withholding all records responsive to the Requests;

(4) Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 5 U.S.C. § 552(a)(4)(E); and

(5) Grant such other and further relief as this Court may deem just and proper.


Dated: January 25, 2018                    Respectfully submitted,

                                           /s/ Jessica Rofé
                                           Sejal Zota
                                           Elizabeth Simpson*
                                           NATIONAL IMMIGRATION PROJECT OF
                                           THE NATIONAL LAWYERS GUILD
                                           14 Beacon Street, Suite 602
                                           Boston, MA 02108
                                           (617) 227-9727
                                           sejal@nipnlg.org
                                           *application for pro hac vice admission
                                           forthcoming

                                           Nancy Morawetz
                                           Jessica Rofé
                                           Terry Ding, Legal Intern
                                           Sarah Thompson, Legal Intern
                                           WASHINGTON SQUARE LEGAL
                                           SERVICES, INC.
                                           Immigrant Rights Clinic

245 Sullivan Street, 5th Floor
New York, NY 10012
(212) 998-6430
nancy.morawetz@nyu.edu
jessica.rofe@nyu.edu

*Attorneys for Plaintiffs*