**IMMIGRANT RIGHTS CLINIC**
**WASHINGTON SQUARE LEGAL SERVICES, INC.**
245 SULLIVAN STREET, 5TH FLOOR
NEW YORK, NEW YORK 10012
TEL: 212-998-6430
FAX: 212-995-4031

<table>
<tr><td>ALINA DAS</td><td>FATIMA CARRILLO</td></tr>
<tr><td>NANCY MORAWETZ</td><td>NORA SEARLE</td></tr>
<tr><td>JESSICA ROFÉ</td><td>KEVIN SIEGEL</td></tr>
<tr><td>*Supervising Attorneys*</td><td>SARAH THOMPSON</td></tr>
<tr><td></td><td>*Legal Interns*</td></tr>
</table>

March 23, 2018

The Hon. Judge Ronnie Abrams
United States District Judge, Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Courtroom 1506
New York, NY 10007

RE:    *Nat'l Immigration Project, et al. v. U.S. Dep't of Homeland Sec., et al.*,
        **No. 18 Civ. 659 (RA), Plaintiffs Letter Regarding Production Schedule**

Dear Judge Abrams,

This letter is submitted in response to the government's letter dated March 16, 2018 and addresses the need for this Court to order a substantial production schedule in this case. Although the parties have made modest progress on prioritization as to two agencies, the Defendants' proposed production schedule is woefully inadequate in light of the nature and importance of the underlying FOIA requests in this case.

The documents Plaintiffs seek pertain to the November 20, 2017 termination of TPS for Haiti. *See* Press Release, U.S. DHS, Acting Secretary Elaine Duke Announcement on Temporary Protected Status for Haiti (Nov. 20, 2017). On March 21, pursuant to the Court's order, DHS and DOS produced to Plaintiffs the "document packages" presented to then-Secretary of State Rex Tillerson and Acting Secretary of Homeland Security Elaine Duke in November 2017. Among the documents are CIS' October 2017 TPS Considerations, which cite the same country conditions that justified previous extensions and even describe Haiti's recovery since 2010 as a "tragic pattern of 'one step forward, two steps back.'" Ex. 1. A subsequent DOS memo sent to Secretary Tillerson on October 30, 2017, and relating to three other TPS countries in addition to Haiti, reads, "The country reports have been edited according to your decisions and will be forwarded to DHS per your decision on this memo." Ex. 2. Thus, even in a heavily redacted form, the documents support Plaintiffs' theory that the decision to terminate TPS for Haiti went beyond the factual consideration mandated by statute and reflected a change in the standard for determining whether to extend.

Since the Parties' last conference, Plaintiffs have sought to prioritize certain documents and custodians, as was requested by the Court. *See* Ex. 3, 4. DOS is willing to follow Plaintiffs' proposed production plan, but has indicated it will process only 300 pages per month. CIS has

1

informed Plaintiffs that it is willing to begin prioritization by producing 100 emails from its International Humanitarian Affairs Division by the end of April.

DHS has reported that its software cannot prioritize specific custodians or time periods without re-running the search and continues to urge Plaintiffs to narrow their search instead of prioritizing custodians. DHS has also stated that this will further delay the production of documents. Plaintiffs' limited understanding of the decision-making process at DHS prevents them from narrowing the request without the risk of losing documents that may be of similar significance to the documents discussed above.

Plaintiffs designed their prioritization plan in the hope that it would lead to a production schedule to which both parties could agree. However, the monthly page numbers proposed by the agencies would create exactly the situation Plaintiffs seek to avoid, in which production is not completed until long after TPS has terminated for Haiti. Plaintiffs remain open to a production schedule that balances prioritization and a modified monthly page number. It would, however, defeat the purpose of this litigation to agree to a schedule that moves as slowly as the agencies propose. To ensure that the documents can factor into the current public debate on TPS for Haiti, Plaintiffs respectfully request that the Court order that each agency produce 1,500 responsive pages per month.

### *Plaintiffs Warrant Expedited Processing*

This FOIA request should be expedited because of the intense media interest in the decision to terminate TPS for Haiti, the doubts it raises as to government integrity, and the possibility of a substantial harm to humanitarian interests.[1]

Defendants insist that Plaintiffs cannot qualify for expedited processing based on the test announced in *Al-Fayed v. CIA*, which governs requests to expedite based on "compelling need," the criterion in FOIA. *See* 254 F.3d 300, 307 (D.C.C. 2001). *Al-Fayed* itself makes clear, however, that FOIA "directs each agency to promulgate regulations providing for expedited processing, not only 'in cases in which the person requesting the record demonstrates a compelling need,' but also 'in other cases determined by the agency.'" 254 F.3d at 307 n.7. Both DHS and DOS have enacted regulations that do just that. DHS' regulation states that requests are to be expedited "whenever the component determines that they involve…[t]he loss of substantial due process rights[] or[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iii)-(iv). DOS' regulation states that requests are expedited "where the requester can demonstrate… [f]ailure to release the information would impair substantial due process rights or harm substantial humanitarian interests…." 22 C.F.R. § 171.11(f)(3).

---

[1] Plaintiffs also note that only one agency, ICE, responded to their request for expedited processing, meaning that there was no opportunity to appeal any denial by the other agencies. Regardless, "although complete exhaustion of administrative remedies is often required…before seeking the court's review of FOIA determinations, it is applied because of specific provisions in FOIA that are inapplicable in the expedited processing context…." *ACLU*, 321 F. Supp. 2d at 29 (internal citations omitted).

In a 2002 case, the D.C. District squarely addressed the issue presented here. There, the government argued that the *Al-Fayed* test controlled despite a Department of Justice regulation that uses the exact language in DHS' regulation. As that court wrote, "[t]he problem with defendant's position is that it is attempting to graft onto the DOJ's regulation FOIA's definition of 'compelling need'…." *Edmonds v. FBI*, No. Civ. A. 02–1294(ESH), 2002 WL 32539613, at *3 (D.D.C. Dec. 3, 2002).

The decision to end TPS for Haiti has generated widespread and exceptional media interest closely related to questions of government integrity.[2] At the end of 2017, the editorial boards of both *The New York Times* and *The Wall Street Journal* published editorials exhorting the Trump administration to allow Haitian TPS beneficiaries to remain in the United States. *See* Ex. 5. Less than two weeks before the Haiti decision, the *Washington Post* reported that Acting Secretary of Homeland Security Elaine Duke "was angered by what she felt was a politically driven intrusion" by the White House into her decision to extend TPS for Honduras. Ex. 6. Other articles have suggested that Duke and another DHS official resigned because of pressure to end TPS. *E.g.*, Ex. 7.

As many outlets have reported, elected officials have acted to address the crisis created by the decision, efforts that would be greatly aided by release of documents related to the decision. The reports range from a letter signed by the attorneys general of New York and New Jersey urging Congress to act to protect beneficiaries of TPS, Ex. 8, to a proposal on March 20 by Rep. Nydia Velasquez to prevent spending on the removal of TPS holders in the House's FY 2019 appropriations bill, Ex. 9. Acknowledging the "extraordinary circumstances" and urgency of "the upcoming deadlines for [TPS countries including Haiti]," Rep. Velasquez wrote that her proposal would "establish a sense of Congress' ability to address the issue and provide the necessary time for the legislative process to provide the appropriate protections needed for TPS and [Deferred Enforced Departure] holders." *Id.* At the end of February, Sen. Bob Menendez wrote Deputy Secretary of State John Sullivan that the latter would see on his upcoming trip to Haiti that "the Department's recommendation to terminate TPS was not based on the facts on the ground, but instead was the result of political interference by the White House in an effort to advance this Administration's xenophobic, anti-immigration agenda." Ex. 10. Major national outlets have also featured extensive coverage of the four lawsuits filed this year that challenge the propriety of the decision to terminate TPS for Haiti. *E.g.*, Ex. 11.

Finally, media reports show the decision to end TPS for Haiti will have grave humanitarian consequences. Already in November, the Canadian press reported that officials expected a wave of Haitians fleeing the United States in the decision's wake, with one member of Parliament even travelling to New York "to meet with leaders of the local Haitian community to try to prevent another exodus of Haitians to Quebec." Ex. 12. *The Boston Globe* quoted

---

[2] In a 2004 case, the D.C. District held that plaintiffs had satisfied the 'media interest' standard by presenting "a handful of articles…published in a variety of publications [that] repeatedly reference the ongoing national discussion about the Patriot Act and section 215 [of the Act]" (the focus of their FOIA request). *ACLU v. U.S. Dep't of Justice*, 321 F. Supp. 2d 24, 31-33 (D.D.C. 2004). In the 2002 case cited above, the plaintiff satisfied the standard by showing that his "allegations [against the FBI's translator program] have received extensive media coverage…[and] fueled the interest of Senators Leahy and Grassley…." *Edmonds*, 2002 WL 32539613, at *3 (also stating that "[n]othing in the DOJ's regulation disqualifies a plaintiff from obtaining expedited processing where the documents may assist her in another lawsuit….").

3

Cardinal Seán O'Malley's warning that "[t]here will be great pain and suffering families will be separated and children possibly left behind as parents are deported….[R]eturning to Haiti at this time means going back to a country still struggling to recover from the effects of a massive earthquake, the outbreak of cholera and the recent impact of Hurricane Matthew." Ex. 13.

Even under the "compelling need" test in *Al-Fayed*, Plaintiffs' requests qualify for expedited processing. First, for the reasons already described, the articles above demonstrate "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). Second, as its mission statement indicates, NIP-NLG is "primarily engaged in disseminating information," *id.* at § 552(a)(6)(E)(v)(I), in the form of "technical assistance and support to community-based immigration organizations." NIP-NLG, *About NIPNLG* (2018), https://www.nationalimmigrationproject.org/about.html. NIP-NLG disseminates information to practitioners and *pro se* immigration litigants through a set of annually-updated books on immigration law, the eleven practice advisories it has published over the past two years, its seminars and webinars, and direct technical assistance to practitioners, all of which are supported by its related litigation. *See Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (finding that national coalition that "disseminates information regarding civil rights and voting rights to educate the public, promote effective civil rights laws, and ensure their enforcement by Department of Justice" met the standard). For example, in 2012, NIP-NLG's FOIA litigation brought to the public's attention DHS' misrepresentation before the Supreme Court of a policy to return individuals deported from the United States who subsequently prevail in their court cases. *See* NATIONAL IMMIGRATION PROJECT, *DHS Policy on Facilitating Post-Deportation Return to U.S.* (2018), https://www.nationalimmigrationproject.org/nipnlgvDHS.html; NATIONAL IMMIGRATION PROJECT, *Sample Declaration for Plaintiffs Seeking Stays of Litigation* (Jun. 23, 2014), https://www.nationalimmigrationproject.org/PDFs/practitioners/our_lit/foia_dhs_return/ 2014_23Jun_morawetz-declar.pdf; Adam Liptak, Justice Department Submits Correction Letter to Supreme Court, N.Y.TIMES, Apr. 24, 2012, https://thecaucus.blogs.nytimes.com/2012/04/24/ justice-department-submits-correction-letter-to-supreme-court/.

### ***The Agencies Have Failed to Demonstrate "Exceptional Circumstances" Warranting Additional Time***

Defendants request "additional time" to process the records, invoking "exceptional circumstances." To show "exceptional circumstances," FOIA requires a showing of delay on a level unanticipated by Congress and not due to predictable agency workload of requests, unless the agency can demonstrate "reasonable progress" in reducing its backlog of requests. *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't*, 236 F. Supp. 3d 810, 819 (S.D.N.Y. 2017) (declining to find exceptional circumstances warranting what was "essentially" a request for a stay of litigation on the part of defendant agencies DHS, DHS Office of Civil Rights and Civil Liberties, and ICE when the defendants failed to make the required showing).

Here, the agency declarations fall short of the specificity courts require to find exceptional circumstances. In a 2014 case, the FBI argued exceptional circumstances based in part on its 144 other FOIA lawsuits. The court found that the agency's "anecdotal evidence" shed insufficient light on the development of its backlog and did not demonstrate that its workload

4

was unpredictable. Moreover, the agency had not made enough progress in reducing its backlog to warrant the stay it requested. *Clemente v. FBI*, 71 F. Supp. 3d 262, 267-68 (D.D.C. 2014) (ordering production of 5,000 pages per month); *see also Bloomberg L.P. v. U.S. FDA*, 500 F. Supp. 2d 371, 376 (S.D.N.Y. 2007) ("[F]airly general submissions by the Government do not make explicit the link between broad agency changes and specific workload reduction efforts targeted at decreasing its FOIA request backlog and, as such, are not sufficiently indicative of due diligence under the circumstances presented by this case.")

The Holzer, Stein, and Eggleston declarations all contain gaps in information that obscure the agencies' workloads and their processing capabilities. Although Holzer states that DHS Privacy processes an "average" of approximately 344 pages per month in connection with 15 separate lawsuits, it is not clear from the declaration whether the agency actually produces the same number of documents to every litigant or if, in fact, some litigants receive significantly more, and some less. Holzer Decl. 4-5. The declaration of Jill A. Eggleston on behalf of CIS does not offer information about how many pages its Significant Interests Group processes currently each week or month. The declaration of Eric F. Stein makes arguments about the Department of State's processing capability while noting that it is "difficult to precisely quantify" its actual processing capability. Stein Decl., 8.[3] This lack of specificity in the representations made by the agencies cannot support a finding of exceptional circumstances.

The agencies' increases in workload also fail to show exceptional circumstances. DHS Privacy maintains that, "[u]ntil recently, [it] typically received approximately 600 to 800 FOIA requests every fiscal year." Holzer Decl., 4. However, DHS Privacy received over 1,000 requests in 2009, 2010 and 2011.[4] CIS reports only a 12.6% increase in requests in Fiscal Year 2017, and an even lower projected increase (8.55%) in Fiscal Year 2018. Holzer Decl. 4.[5] DOS describes a backlog going back to 2008 and argues their increasing backlog is "directly correlated" to compliance with court orders.[6] However, Stein fails to mention that the number of requests received by DOS has *decreased* significantly, from 27,961 in 2016 to 7,688 in 2017.[7] Finally, the staffing vacancies the agencies aver do not justify delayed production because they reflect an

---

[3] Additionally, while defense counsel represents that DOS produces an "average" of 533 pages per month in its court-ordered productions, the agency's own declaration indicates that in fact it produces many more pages for some cases than others (in one case, DOS is apparently processing 1,850 pages per month, while in others it processes 300 pages per month). Stein Decl., 12.

[4] DHS 2011 Freedom of Information Act Report to the Attorney General of the United States, 4 (Feb. 2012) https://www.dhs.gov/xlibrary/assets/privacy/privacy-foia-annual-report-fy-2011-dhs.pdf; DHS 2011 Freedom of Information Act Report to the Attorney General of the United States, 3 (Feb. 2011); https://www.dhs.gov/xlibrary/assets/foia/privacy-rpt-foia-2010.pdf; DHS 2009 Freedom of Information Act Report to the Attorney General of the United States, 5 (Feb. 2010); https://www.dhs.gov/xlibrary/assets/foia/privacy_rpt_foia_2009.pdf

[5] The agency reports a projected increase of 8.55% in requests in FY 2018 based on historic trends but, notably, if the number of requests continues at the same rate as the requests received in the first quarter of 2018, the agency will in fact receive 25,557 fewer requests than it did in 2017. Department of Homeland Security in Quarter 1 of Fiscal Year 2018, https://www.foia.gov/quarter.html?DHS

[6] Additionally, the lack of progress DOS has made in closing cases is concerning; it closed 43 cases in 2017 and had 107 pending, although their incoming requests dropped precipitously that year. *See* The FOIA Project, http://foiaproject.org/lawsuit/

[7] U.S. Department of State, Freedom of Information Act Report, Fiscal Year 2017, 13, https://foia.state.gov/Learn/Reports/Annual/2017.pdf; U.S. Department Of State, Freedom of Information Act Report, Fiscal Year 2016, 11, https://foia.state.gov/Learn/Reports/Annual/2016.pdf

unexplained failure to fill positions. *Cf. Elec. Frontier Found. v. Dep't of Justice*, 517 F. Supp. 2d 111, 116 (D.D.C. 2007) (granting stay on the grounds that the agency faced 115 vacancies and were unable to ameliorate the issue due to a hiring freeze). The increased workloads asserted by the agencies are thus not a justification for additional time.[8]

Furthermore, Defendants' argument that Plaintiffs have failed to "reasonably narrow" their request is without merit on multiple fronts. Plaintiffs have narrowed their request significantly with respect to the timeframe, narrowing it from eight years to one year for all documents requested except for the pre-2017 briefing packets. *See also EPIC v. FBI*, 933 F. Supp.2d 42, 47, 50 (D.D.C. 2013) (stating that FBI had not shown exceptional circumstances despite increase in requests from 17,755 in FY 2011 to 19,599 in FY 2012, plaintiff's decision not to narrow, and amount of classified material). As stated, Plaintiffs are not certain where the agencies' responsive documents are located and are therefore not in a position to narrow without risking the loss of responsive documents.

### *Plaintiffs' Proposed Production Schedule*

Plaintiffs propose that each Defendant agency produce 1,500 pages of responsive documents per week. By enabling full production in time for the fall 2019 legislative session, this schedule will ensure that legislators and the public have sufficient information as they consider proposals for a solution to the crisis created by the termination of TPS for Haiti.

The cases Defendants cite do not support the schedule it proposes of 300 to 500 pages per month. In six, Plaintiffs had not requested expedited processing or had not shown that their requests merited rapid production, either in the context of expedited processing or otherwise. *See* Appx. 1. In the remaining four, the Parties were in general agreement about the rate of production. *See id*.

At the same time, courts have regularly ordered rates of production between 1,000 and 10,000 pages per month. In these cases, Plaintiffs have, as here, generally invoked expedited processing. Most of the underlying requests related to topics with far less pressing humanitarian concern compared with Plaintiffs' requests, such as email use at DOS and historical FBI mafia investigations. In two other cases that related to ICE enforcement operations, S.D.N.Y. ordered production schedules of 2,000 and 10,000 pages.

### *Conclusion*

Plaintiffs respectfully request that the Court grant their request for expedited processing, deny Defendants' request for a finding of exceptional circumstances, and order production of 1,500 pages per month per agency.

---

[8] *See, e.g. Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 10 Civ. 3488 (SAS) (S.D.N.Y. 2011) (ordering ICE to produce 5,000 pages within approximately two weeks). Notably, this order was made during a year in which the number of requests directed at ICE had increased by over 93%. See FOIA.gov, *Department of Homeland Security FOIA Requests Received, Processed and Pending* https://www.foia.gov/data.html

Respectfully submitted,

/S/ Nancy Morawetz____
Nancy Morawetz
Jessica Rofé
Fatima Carrillo, Legal Intern
Nora Searle, Legal Intern
Kevin Siegel, Legal Intern
Sarah Thompson, Legal Intern
WASHINGTON SQUARE LEGAL
SERVICES, INC.
Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, NY 10012
nancy.morawetz@nyu.edu
jessica.rofe@nyu.edu

Sejal Zota
NATIONAL IMMIGRATION
PROJECT OF THE NATIONAL
LAWYERS GUILD
14 Beacon Street, Suite 602
Boston, MA 02108
(617) 227-9727
sejal@nipnlg.org

Attorneys for Plaintiffs

7

# Appendix One:
## Cases Cited in Defendants' March 16, 2018 Letter

| CASE NAME | PROCESSING MONTHLY | PARTY AGREEMENT | ASKED FOR EXPEDITED PROCESS | DECISION AND ORDER |
|---|---|---|---|---|
| *Energy & Env't Legal Inst. v. U.S. Dep't of State*, No. 17 Civ. 340 (D.D.C.) | 300 | Y | N | Both parties agreed to *review and production* of 300 pages per month. Dkt. No. 13. |
| *Citizens United v. U.S. Dep't of State*, No. 15 Civ. 1720 (D.D.C.) | 500 | Y | Y | Both parties agreed on a processing rate of 500 pages every four weeks, only disagreeing on the date of the first batch of production. Dkt. No. 11 |
| *Judicial Watch, Inc. v. U.S. Dep't of State*, No. 15 Civ. 687 (D.D.C.) | 500 | Y | N | Court ordered processing 500 pages per month following a status conference where Plaintiffs did not seem to object or ask for briefing for a more accelerated production schedule. Minute Order of April 4, 2017 |
| *Leopold v. U.S. Dep't of State*, No. 14 Civ. 1770 (D.D.C.) | 400 | Y | Y | Parties reached an agreement on a production rate based on review of 400 pages per month. Dkt. No. 32 |
| *Middle E. Forum v. U.S. Dep't of Homeland Sec.*, No. 17 Civ. 767 (RCL) (GMH), 2018 U.S. Dist. LEXIS 35708, at *8 (D.D.C. Mar. 5, 2018) | 500 | N | Y (Denied) | Court denied setting a processing rate higher than 500 pages per month because the plaintiff failed to establish the need for expedited processing or that the material is of significant importance to the debates of the day and were of time sensitive nature. |

1

| CASE NAME | PROCESSING MONTHLY | PARTY AGREEMENT | ASKED FOR EXPEDITED PROCESS | DECISION AND ORDER |
|---|---|---|---|---|
| *Republican Nat'l Comm. v. U.S. Dep't of State*, No. 16 Civ. 486 (JEB) (D.D.C.) | 500 | N | N | Court noted that processing 500 pages per month was reasonable in this case, particularly since Plaintiffs had not sought expedited processing. Dkt. No. 14 |
| *Judicial Watch, Inc. v. U.S. Dep't of State*, No. 17 Civ. 205 (D.D.C.) | 300 | N | N | Although Plaintiffs argued for the public's right to know, there was no imminent decision that could be affected by knowledge of this info since the case involved exposing potential wrongdoing in the past for the sake of transparency. Plaintiffs asked for a faster production schedule but did not explicitly ask for expedited processing. Dkt. No. 11 |
| *Am. Ctr. for Law & Justice v. U.S. Dep't of State*, No. 16 Civ. 2516 (D.D.C.) | 600 | N | Y (Denied) | Plaintiffs sought processing at least 600 pages per month, but failed to show why this particular case warranted a higher rate of production. Dkt. No. 31 |
| *Citizens United v. U.S. Dep't of State*, No. 16 Civ. 67 (D.D.C.) | 300 | N | Y (Denied) | Plaintiffs asked the court for a higher rate of production but failed to show the need for an expedited production rate, especially in light of the fact that in the last 6 months Plaintiffs had received batches of production of 439 pages and would receive another 521 pages soon after. Dkt. No. 17 |
| *Freedom Watch v. Bureau of Land Mgmt.*, No. 16 Civ. 2320 (D.D.C.) | 500 | N | Y (Denied) | Court denied Plaintiffs request for a higher processing rate than 500 pages monthly because "Plaintiff has not furnished the Court with any reason, based in fact or law, for expediting the production of documents beyond the schedule proposed." Minute Order of June 13, 2017 |

**Appendix Two:**

**Case Chart: Sample Cases with Rates of Processing and Production Between 1,000 and 10,000 Pages Per Month**

| CASE NAME | MONTHLY PROCESSING RATE[1] | PARTY AGREEMENT | EXPEDITED PROCESSING REQUESTED? | DECISION AND ORDER | SUBJECT OF FOIA REQUEST |
|---|---|---|---|---|---|
| National Day Laborer Organizing Network et al v. United States Immigration and Customs Enforcement Agency et al. , 10-cv-03488-SAS, (S.D.N.Y) | ~10,000 (FBI and ICE ordered to produce 5,000 documents over approx. two-week periods) | N | Y - denied by ICE, DHS, OLC (appealed, agencies did not respond to appeals prior to filing of complaint), not responded to by EOIR, granted by FBI | "(1) DHS shall produce responsive FPL Records in accordance with the following schedule: (a) Initial production no later than July 29, 2011; (b) 1,500 pages no later than August 12th; (c) 1,500 pages no later than August 26th; (d) All remaining pages no later than September 19th. (2) FBI shall produce responsive FPL Records in accordance with the following schedule: (a) Initial production no later than July 29th; (b) 5,000 pages no later than August 12th; (c) 5,000 pages no later than August 26th; (d) 5,000 pages no later than September 9th; (e) All remaining pages no later than September 12th. (3) ICE shall produce 5,000 pages of responsive FPL Records no later than August 15th." Dkt. No. 104. | Records relating to ICE's Secure Communities Program. |
| Lardner v. Fed. Bureau of Investigation, 03-cv-874 (D.D.C) | 5,000 | Y | N | The FBI anticipated processing approximately 5,000 pages per month with rolling releases each month starting in June 2012 and anticipated complete production by June 2013. Dkt. No. 111. | Records dating to 1960 relating to deceased underbosses of the Gambino crime family and FBI's Top Hoodlum Program. |

[1] The processing rate may not have been constant every month, but it demonstrates peaks in processing rates that far exceed the 300-page monthly proposal.

| CASE NAME | MONTHLY PROCESSING RATE[1] | PARTY AGREEMENT | EXPEDITED PROCESSING REQUESTED? | DECISION AND ORDER | SUBJECT OF FOIA REQUEST |
|---|---|---|---|---|---|
| Greenberger v. Internal Revenue Serv., 15-cv-3710, (N.D. Ga.) | ~4,485 | N | N | IRS identified 26,910 pages of responsive documents, and the court ordered the IRS to produce these documents in four installments between March 17, 2016 and September 28, 2016. The IRS produced 3,666 pages on July 6, 10,866 pages on August 3, 3,339 pages on August 31, and 9,309 pages on September 28. Dkt. Nos. 29 and 42 | Allegations of error in the preparation of conservation partnership returns. |
| Cause of Action Institute v. U.S. Department of State, 16-cv-02074-RC (D.D.C.) | 3,017 | Y | N (but did request that the court order Defendants to produce the documents "expeditiously") | The Department of State processed 3,017 pages for the second batch of production and 543 pages for the third batch of production. The parties seemed to be in agreement as to processing rate at which Defendants will be reviewing and producing documents to Plaintiffs. Having received all the documents sought, Plaintiffs agreed to a Joint Stipulation of Dismissal within a year of the start of litigation. Dkt. No. 16. | Hillary Clinton's compliance with ethics agreement and other federal government ethics rules. |
| Citizens United v. U.S. Dep't of State, 16-cv-48 (RC) (D.D.C.) | 3,000 | N | Y - granted by DOS | The court initially ordered the Department of State to produce what, at the time, it asserted were approximately 6,000 documents (or approximately 12,000 pages), in four months. The rate of processing ranged from 2,000 to 4,000 pages per month. Dkt. No. 16. | Emails between State Department officials and Clinton Foundation addressees. |

| CASE NAME | MONTHLY PROCESSING RATE[1] | PARTY AGREEMENT | EXPEDITED PROCESSING REQUESTED? | DECISION AND ORDER | SUBJECT OF FOIA REQUEST |
|---|---|---|---|---|---|
| Leopold v. U.S. Department of State, 15-cv-123-RC (D.D.C.) | 2,200 (for the first 13 months of production) | Y | Y - denied by DOS | The Department of State processed approximately 30,000 emails consisting of 55,000 pages in less than a year. After the 55,000 pages of emails were processed, State then processed remaining related records at 700 pages per month graduating up to 2,200 pages per month. Dkt. No. 80. | "[A]ny and all records that were prepared, received, transmitted, collected and/or maintained by the Department of State (DOS) mentioning or referring to or prepared by Secretary of State Hillary Clinton or any member of the Office of the Secretary (S) from January 21, 2009 to February 1, 2013." Dkt. No. 1. |
| Immigrant Defense Project v. U.S. ICE, 14-cv-6117 (S.D.N.Y.) | 2,000 | N | Y - denied by ICE and DHS | The court ordered ICE to produce 1,500 pages during the first month after the order and 2,000 pages of responsive documents per month thereafter. Dkt. No. 15. | Records related to home raids or home enforcement operations in New York and Alabama. |
| Leopold v. DOJ, 15-cv-2117 (D.D.C.) | 1,906 | Y | Y - agency did not respond to request prior to filing of complaint | The court ordered the DOS to review minimum of 1,850 pages per month of documents from the information provided to DOS by the FBI. Order. But agency was actually able to process at a rate of approximately 2,000 pages per month for 13 months. *See* Dkt. No. 30, 31, 32, 35, 36, 37, | Records relating to the server, thumb drive, and any other electronic equipment obtained either directly or indirectly from Hillary Clinton |

| CASE NAME | MONTHLY PROCESSING RATE[1] | PARTY AGREEMENT | EXPEDITED PROCESSING REQUESTED? | DECISION AND ORDER | SUBJECT OF FOIA REQUEST |
|---|---|---|---|---|---|
| | | | | 38, 39, 40, 41, 42, 43. | |
| Associated Press v. U.S. Department of State, 15-cv-345-RJL (D.D.C.) | ~1,650 | N | Y - denied by DOS | The court ordered the Department of State to process pursuant to a graduated system as follows: 68 pages in first 30 days; 4850-4950 pages in next 90 days (roughly 1650 per month); then 13,387 pages within next 240 days (rolling production every 30 days) (roughly 1675 per month). Dkt. No. 17. | Records from the State Department regarding Secretary Clinton's official actions. |
| Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice, 160 F. Supp.3d 226, 231 (D.D.C. 2016) | 1,500 | N | Y - denied by FBI, not responded to by DOJ prior to filing of complaint | The court ordered the Department of Justice to process at least 1,500 of responsive records per month. | Cell-site simulator technology. |
| American Center for Law and Justice v. U.S. Dep't of State, No. 16 Civ. 1975 (D.D.C.) | 1,000 | N | Y - granted by DOS | Despite Defendant's objection, the court ordered the Department of State to review and process 1,000 pages every thirty days and produce all non-exempt, responsive material to Plaintiff on the 19th day of each month. Dkt. No. 31. | Allegations of financial misdealing by Hillary Clinton and the Clinton Foundation. Dkt. No. 1, Ex. A |

4