UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, and MARGARET SATTERTHWAITE,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, and U.S. CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>Defendants. | No. 18 Civ. 659 (RA) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY AND THE UNITED STATES DEPARTMENT OF STATE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2699
Fax: (212) 637-2686
caleb.hayes-deats@usdoj.gov

Of Counsel:

CALEB HAYES-DEATS
Assistant United States Attorney

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ..........................................................................................................2

      A.      Temporary Protected Status.........................................................................2

      B.      Haiti's Designation for TPS and Its Termination ......................................4

      C.      Plaintiffs' FOIA Requests...........................................................................7

      D.      DHS's and State's Productions to Date ......................................................9

ARGUMENT..............................................................................................................................10

I.      FOIA & THE SUMMARY JUDGMENT STANDARD ......................................11

II.      THE DELIBERATIVE –PROCESS PRIVILEGE PROTECTS
      INFORMATION GENERATED TO ASSIST THE SECRETARY
      OF HOMELAND SECURITY IN MAKING DECISIONS ABOUT
      HAITIAN TPS ......................................................................................................12

      A.      The Information Withheld Under the Deliberative Process Is
            Predecisional and Deliberative ..................................................................13

            1.      Secretary Tillerson's October 31, 2017, Letter and the
                   Underlying Review Packet ...............................................................13

            2.      CIS's November 3, 2017, Decision Memorandum........................14

            3.      The Deputy General Counsel's Memorandum ..............................14

            4.      DHS's March 29, 2018, Production.................................................15

      B.      Plaintiffs' Arguments Against the Application of the Deliberative-Process
            Privilege Fail..............................................................................................16

            1.      The Secretaries Did Not Rely on Working Law When Making
                   Decisions About Haitian TPS .........................................................16

            2.      When Reviewing TPS Designations, the Secretary Interprets
                   A Statue and Formulates Policy.......................................................18

3.     The Withheld Materials Do Not Contain Segregable, Wholly Factual Information..........................................................................21

4.     Courts Have Declined to Recognize Subject-Matter Waiver of the Deliberative-Process Privilege.............................................22

III.   THE ATTORNEY-CLIENT PRIVILEGE PROTECTS THE MEMORANDUM DHS'S DEPUTY GENERAL COUNSEL TO THE DEPUTY SECRETARY ........................................................................23

IV.   EXEMPTION 6 PROTECTS LINE-LEVEL EMPLOYEES' NAMES FROM DISCLOSURE....................................................................24

CONCLUSION.......................................................................................26

## TABLE OF AUTHORITIES

### Cases

*Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys.*,
  649 F. Supp. 2d 262 (S.D.N.Y. 2009) ................................................................ 11

*Brennan Ctr. for Justice at N.Y.U. Sch. of Law v. U.S. Dep't of Justice*,
  697 F.3d 184 (2d Cir. 2012) ..................................................... 16, 17, 18, 22

*Carney v. U.S. Dep't of Justice*,
  19 F.3d 807 (2d Cir. 1994) ................................................................ 11

*Chevron, U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) ................................................................ 19

*CIA v. Sims*,
  471 U.S. 159 (1985) ................................................................ 11

*EPA v. Mink*,
  410 U.S. 73 (1973) ................................................................ 21

*Ferguson v. FBI*,
  No. 89 Civ. 5071 (RPP), 1995 WL 329307 (S.D.N.Y. June 1, 1995) ..................... 11

*Ford Motor Co. v. United States*,
  94 Fed. Cl. 211 (Fed. Cl. 2010) ................................................................ 22

*Grand Cent. P'ship, Inc. v. Cuomo*,
  166 F.3d 473 (2d Cir. 1999) ................................................................ *passim*

*Hopkins v. HUD*,
  929 F.2d 81 (2d Cir. 1991) ................................................................ 12

*In re Cnty. of Erie*,
  473 F.3d 413 (2d Cir. 2007) ................................................................ 10, 23

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ................................................................ 23

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989) ................................................................ 11

*Lead Indus. Assoc. v. OSHA*,
  610 F.2d 70 (2d Cir. 1979) ................................................................ 20, 21

*Mejia Rodriguez v. U.S. Dep't of Homeland Sec.*,
562 F.3d 1137 (11th Cir. 2009) ................................................................................ 2

*N.Y. Times v. Dep't of Justice*,
872 F. Supp. 2d 309 (S.D.N.Y. 2012) ..................................................................... 11

*Nat'l Council of La Raza v. U.S. Dep't of Justice*,
411 F.3d 350 (2d Cir. 2005) ............................................................................. 17, 23

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) .............................................................................. 12, 17, 18

*Petroleum Info. Corp. v. U.S. Dep't of Interior*,
976 F.2d 1429 (D.C. Cir. 1992) ............................................................................. 19

*Renegotiation Board v. Grumman Aircraft Engineering Corp.*,
421 U.S. 168 (1975) ................................................................................................ 12

*Tax Analysts v. IRS*,
117 F.3d 607 (2d Cir. 1997) ............................................................................. 23, 24

*Tigue v. Dep't of Justice*,
312 F.3d 70 (2d Cir. 2002) ............................................................................ *passim*

*AP v. U.S. Dep't of Def.*,
554 F.3d 274 (2d Cir. 2009) ................................................................................... 24

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*,
489 U.S. 749 (1989) ............................................................................................... 25

*U.S. Dep't of State v. Wash. Post Co.*,
456 U.S. 595 (1982) ......................................................................................... 24, 25

*United States v. Wells Fargo Bank, N.A.*,
No. 12 Civ. 7527 (JMF), 2015 WL 6395917 (S.D.N.Y. Oct. 22, 2015) .................. 22

*Urban Air Initiative, Inc. v. EPA*,
271 F. Supp. 3d 241 (D.D.C. 2017) ....................................................................... 20

*Wood v. FBI*,
432 F.3d 78 (2d Cir. 2005) ............................................................................ *passim*

**<u>Statutes</u>**

5 U.S.C. § 552 ................................................................................................................... *passim*

6 U.S.C. § 557 ............................................................................................................................ 2

8 U.S.C. § 1254a(b) ...................................................................................................... *passim*

Pub. L. No. 101-649 .................................................................................................................. 2

**<u>Rules</u>**

Federal Rule of Civil Procedure 56(a) .................................................................................. 11

**<u>Regulations</u>**

62 Fed. Reg. 16,608 .................................................................................................................. 4

75 Fed. Reg. 3,476 .................................................................................................................... 5

76 Fed. Reg. 29,000 .................................................................................................................. 5

77 Fed. Reg. 59,943 .................................................................................................................. 5

79 Fed. Reg. 11,808 .................................................................................................................. 5

80 Fed. Reg. 51,582 .................................................................................................................. 5

82 Fed. Reg. 23,830 .............................................................................................................. 6, 18

83 Fed. Reg. 2,648 ......................................................................................................... 7, 16, 18

## PRELIMINARY STATEMENT

Defendants the United States Department of Homeland Security ("DHS") and the United States Department of State ("State"), by their attorney Geoffrey S. Berman, the United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion for summary judgment. This case arises from Plaintiffs' requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for "recommendation[s]" made by "any employee" of DHS and State about whether to extend or terminate Haiti's designation for temporary protected status ("TPS") under 8 U.S.C. § 1254a(b). As set forth in well-established Second Circuit precedent, "recommendations" concerning policy decisions such as whether to extend or terminate a TPS designation are protected by the deliberative-process privilege, and thus properly withheld under FOIA Exemption 5. *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999); *see also* 5 U.S.C. § 552(b)(5). Thus, by their terms, Plaintiffs' FOIA requests seek information that FOIA permits DHS and State to withhold.

To date, DHS and State have processed and released non-exempt portions of documents advising cabinet secretaries about what they should decide or recommend with regard to Haiti's TPS designation, as well as internal emails and draft reports discussing that designation. Plaintiffs have raised three challenges to DHS's and State's withholdings of material from those documents. Each challenge fails. First, Plaintiffs have contested the withholding of the recommendations that DHS and State officials made concerning Haiti's TPS designation. But such recommendations are precisely what the deliberative-process privilege protects from disclosure. *See infra* Part II. If accepted, Plaintiffs' position would upset decades of precedent and "unreasonably hamper agencies in their decision-making process." *Tigue v. Dep't of Justice*, 312 F.3d 70, 79 (2d Cir. 2002). Second, Plaintiffs challenge the withholding of a memorandum

from DHS's Deputy General Counsel to its Deputy Secretary under the attorney-client privilege. Because that memorandum contains confidential legal advice, however, it falls well within the scope of the asserted privilege. *See infra* Part III. Finally, Plaintiffs challenge DHS's redaction of line-level employees' names under Exemption 6, which protects against the "unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). But Second Circuit precedent has recognized that the public's interest in identifying line-level officials' names is "minimal at best" and far outweighed by the individuals' privacy interests. *Wood v. FBI*, 432 F.3d 78, 88–89 (2d Cir. 2005) (Sotomayor, *J.*); *see also* Part IV. Because each of Plaintiffs' challenges conflicts with Second Circuit precedent, the Court should grant partial summary judgment upholding DHS's and State's redactions under Exemptions 5 & 6.

## STATEMENT OF FACTS

### A.    Temporary Protected Status

Under 8 U.S.C. § 1254a(b), the Secretary of Homeland Security, "after consultation with appropriate agencies of the Government," may designate "any foreign state (or any part of such foreign state)" for TPS.[1] The Secretary may do so, however, "only if" she "finds" that the foreign state satisfies one of three sets of criteria:

> (A) the [Secretary] finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (B) the [Secretary] finds that—

---

[1] Congress originally provided for TPS designations in the Immigration Act of 1990, and it conferred the authority to make such designations on the Attorney General. *See* Pub. L. No. 101-649, § 302, 104 Stat. 4978 (1990). Following the creation of the Department of Homeland Security, Congress transferred responsibility for TPS designations from the Attorney General to the Secretary of Homeland Security. *See* 6 U.S.C. § 557 (providing that, for "any function transferred by" Chapter 1 of Title 6, statutory references to other officials "shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred"); *Mejia Rodriguez v. U.S. Dep't of Homeland Sec.*, 562 F.3d 1137, 1140 n.3 (11th Cir. 2009) (explaining that the Homeland Security Act of 2002 transferred the functions of the Immigration and Naturalization Service to DHS).

(i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

(ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

(iii) the foreign state officially has requested designation under this subparagraph; or

(C) the [Secretary] finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1)(A)–(C). The statute does not have a definitions provision, and it does not provide guidance on what constitutes a "substantial, but temporary, disruption of living conditions," when a "foreign state is unable, temporarily, to handle adequately the return" of its nationals, or when permitting aliens to remain in the United States is "contrary to the national interest." *Id.* Instead, the statute leaves such determinations to the discretion of the Secretary of Homeland Security, explicitly basing each criterion on what the Secretary "finds." *Id.* Moreover, Congress prohibited "judicial review of any determination of the [Secretary] with respect to the designation . . . of a foreign state" for TPS. *Id.* § 1254a(b)(5)(A).

As its name suggests, Congress intended for TPS to be temporary. *See, e.g.*, 136 Cong. Rec. S17106, S17108–09, 1990 WL 165401 (Sen. DeConcini) ("This bill would not grant permanent resident alien status."). When initially designating a country for TPS, the Secretary must specify a period of designation lasting "not less than 6 months and not more than 18 months." 8 U.S.C. § 1254a(b)(2)(B). At least sixty days before the end of the initial period of designation and any subsequent extended period, the Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . and

3

shall determine whether the conditions for such designation . . . continue to be met." *Id.* § 1254a(b)(3)(A). If the Secretary determines that they are, then she can extend the designation for six, twelve, or eighteen months. *Id.* § 1254a(b)(3)(C). In contrast, if she determines that the foreign state "no longer continues to meet the conditions for designation," the Secretary "shall terminate the designation." *Id.* § 1254a(b)(3)(B). When designating, extending, or terminating a TPS designation, the Secretary must publish a notice in the *Federal Register* setting forth her findings. *Id.* § 1254a(b)(1)(C), (3)(A)–(B). Extensions and terminations of TPS, like initial designations, are not subject to judicial review. *Id.* § 1254a(b)(5)(A); *see also* H.R. Rep. No. 101-245, at 14 (1989) ("[N]one of the [Secretary's] decisions with regard to granting, extending, or terminating TPS will be subject to judicial review.").

In addition to terminating or extending a TPS designation, the Secretary may also redesignate a country for TPS. *See* 8 U.S.C. § 1254a(b); *see also* Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program, 62 Fed. Reg. 16,608, 16,609 (Apr. 7, 1997) (discussing statutory bases for redesignation). A redesignation can have a significant impact on who is eligible to benefit from a TPS designation. For a country's TPS designation to protect one of its citizens, that citizen must have "continuously resided in the United States since such date as the Attorney General may designate." *See* 8 U.S.C. § 1254a(c). Unlike a decision to extend a TPS designation, a redesignation often expands the population of foreign nationals eligible for TPS to include those who began to reside in the United States after the date specified in the initial designation, but before that identified in the redesignation. *Id*.

**B.    Haiti's Designation for TPS and Its Termination**

On January 21, 2010, then-Secretary of Homeland Security Janet Napolitano initially designated Haiti for TPS for a period of eighteen months based on a "7.0-magnitude earthquake"

4

that struck the country. *See* Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3,476, 3,476–77 (Jan. 21, 2010). This designation covered "Hatian nationals . . . who have continuously resided in the United States since January 12, 2010," the date of the earthquake. *Id.* at 3,476. In May 2011, Secretary Napolitano both extended Haiti's existing TPS designation for eighteen months and redesignated Haiti for TPS for eighteen months. *See* Extension and Redesignation of Haiti for Temporary Protected Status, 76 Fed. Reg. 29,000, 29,000 (May 19, 2011). The redesignation covered Haitian nationals "who have been continuously residing in the United States since January 12, 2011." *Id.* Haiti's TPS designation was subsequently extended on October 1, 2012, March 3, 2014, and August 25, 2015, ensuring that the designation would last through July 22, 2017. *See* Extension of the Designation of Haiti for Temporary Protected Status, 80 Fed. Reg. 51,582, 51,582–83 (Aug. 25, 2015); Extension of the Designation of Haiti for Temporary Protected Status, 79 Fed. Reg. 11,808, 11,808–09 (Mar. 3, 2014); Extension of the Designation of Haiti for Temporary Protected Status, 77 Fed. Reg. 59,943, 59,943 (Oct. 1, 2012).

Beginning in 2016, the Obama administration's immigration policies began to reflect a recognition that the country conditions in Haiti had improved. *See* Statement by Secretary Johnson Concerning His Directive to Resume Regular Removals to Haiti (Sept. 22, 2016), at https://www.dhs.gov/news/2016/09/22/statement-secretary-johnson-concerning-his-directive-resume-regular-removals-haiti. Following the earthquake that initially gave rise to Haiti's TPS designation, U.S. Immigration and Customs Enforcement ("ICE") temporarily ceased removing Haitian nationals to Haiti. *Id.* On September 22, 2016, however, then-Secretary of Homeland Security Jeh Johnson determined that "the situation in Haiti has improved sufficiently to permit the U.S. government to remove Haitian nationals on a more regular basis, consistent with the practice for nationals from other nations." *Id.* Thus, based on its conclusion that Haiti's country

5

conditions had improved, the Obama administration began to remove Haitian nationals who had not continuously resided in the United States since January 12, 2011, the date specified in Haiti's last redesignation for TPS. *See* 76 Fed. Reg. at 29,000.

The Trump administration found that conditions in Haiti had further improved, and its decisions regarding Haiti's TPS designation reflected that finding. In May 2017, then-Secretary of Homeland Security John Kelly extended Haiti's TPS designation for six months, rather than eighteen, to January 22, 2018. *See* Extension of the Designation of Haiti for Temporary Protected Status, 82 Fed. Reg. 23,830, 23,830 (May 24, 2017). Secretary Kelly found that, "[a]lthough lingering effects of the 2010 earthquake remain, Haiti has made significant progress in addressing issues specific to the earthquake." *Id.* at 23,832. He also described the six-month extension as "limited" and encouraged TPS beneficiaries "to prepare for their return to Haiti, including [by] requesting updated travel documents." *Id.* at 23,831.

On November 20, 2017, then-Acting Secretary of Homeland Security Elaine Duke announced that she had decided to terminate Haiti's TPS designation as of July 22, 2019, based on her determination that the "extraordinary but temporary conditions caused by the 2010 earthquake no longer exist[ed]." *See* Acting Secretary Elaine Duke Announcement on Temporary Protected Status for Haiti (Nov. 20, 2017), at https://www.dhs.gov/news/202017/11/20/acting-secretary-elaine-duke-announcement-temporary-protected-status-haiti. Secretary Duke explained that, "[s]ince the 2010 earthquake, the number of displaced people in Haiti has decreased by 97 percent," and "Haiti is able to safely receive traditional levels of returned citizens." *Id.*

On January 18, 2018, in accordance with 8 U.S.C. § 1254a(b)(3)(B), then-Deputy Secretary Duke published a *Federal Register* notice explaining her decision to terminate Haiti's

6

TPS designation. *See* Termination of the Designation of Haiti for Temporary Protected Status, 83

Fed. Reg. 2,648, 2,648 (Jan. 18, 2018).[2] In support of her finding that "the conditions for Haiti's

designation for TPS . . . are no longer met," Deputy Secretary Duke noted several factors:

1. "Haiti has made progress recovering from the 2010 earthquake and subsequent effects that formed the basis for its designation. For example, the number of internally displaced persons (IDP) from the earthquake has continued to decline—98 precent of IDP sites have closed, and only approximately 38,000 of the estimated 2 million Haitians who lost their homes in the earthquake were still living in camps as of June 2017."

2. "In October 2017, the United Nations withdrew its peacekeeping mission, noting the mission had achieved its goals. The peacekeeping mission has been replaced by a successor operation that is a police-only force focused on strengthening rule of law, promoting human rights and supporting the Haitian National Police."

3. "Haiti successfully completed its presidential election in February 2017. The 2010 earthquake destroyed key government infrastructure, including dozens of primary federal buildings, which the Haitian government is working to rebuild. The Supreme Court is already reconstructed and operational, and, in April 2017, President Moïse announced a project to rebuild Haiti's National Palace. A Palace spokesperson announced on January 8 that a project to reconstruct the Palace would commence on January 12, 2018."

4. "Haiti's economy continues to recover from the 2010 earthquake. Annual GDP growth has been generally positive since 2010, averaging 1.7 percent over the period (2010-2016)."

*Id.* at 2,650.

C.      **Plaintiffs' FOIA Requests**

On November 22, 2017, two days after Secretary Duke announced her decision to

terminate Haiti's TPS designation, Plaintiffs filed a FOIA request with DHS seeking two

categories of information: (1) "[a]ll records sent by or to Elaine Duke . . . relating to TPS for

nationals of Haiti"; and (2) "[a]ll records relating to and including a letter dated on or about

October 31, 2017 from Secretary of State Rex Tillerson to Elaine Duke . . . informing her that

---

[2] Following the confirmation of Kirstjen Nielsen as Secretary of Homeland Security on December 5, 2017, Elaine Duke stepped down as Acting Secretary and returned to her prior role as Deputy Secretary of Homeland Security. *See* https://www.dhs.gov/news/2017/12/05/acting-secretary-duke-statement-senate-confirmation-kirstjen-nielsen.

conditions in Haiti no longer justify its TPS designation." *See* Dkt. No. 30-1. Two days later, Plaintiffs filed a second FOIA request, this time not only with DHS, but also with State and two components of DHS. *See* Dkt. No. 30-4. Plaintiffs' second request sought nineteen broad categories of records, including (1) "any recommendation made by any employee of the DHS [or State] for the extension or redesignation of TPS for nationals of Haiti since January 20, 2017"; (2) "any recommendation made by any employee of [DHS or State] for the termination of TPS for nationals of Haiti since January 20, 2017"; (3) all "correspondence and/or communications between any employee of [DHS] and any employee of [State] regarding TPS for nationals of Haiti since January 20, 2017"; and (4) "[a]ll records pertaining to current country conditions of Haiti . . . since November 1, 2016." *Id.*

On January 25, 2018, one week after Deputy Secretary Duke published the *Federal Register* notice explaining the decision to terminate Haiti's TPS designation, Plaintiffs filed this lawsuit. Dkt. No. 2. Before this Court, Plaintiffs initially asked that that DHS and State prioritize a specific set of documents:

> the letter dated approximately 10/31/17 from Secretary Tillerson to Acting Secretary Duke, together with the packets of documents reviewed by: (1) Secretary Tillerson prior to his 10/31/17 letter to Acting Secretary Duke; (2) Acting Secretary Duke prior to her 11/20/17 announcement; and (3) [Deputy Secretary Duke] prior to the 1/18/18 publication of the termination of TPS for Haiti in the Federal Register.

Dkt. No. 38 at 2. Subsequently, Plaintiffs asked DHS to reprocess a set of documents that DHS had previously released to the National Immigration Law Center ("NILC") in July 2017. *See* Dkt. 41 at 2. In contrast to the documents that Plaintiffs initially asked DHS and State to prioritize, the documents DHS released to NILC do not relate to Secretary Duke's termination of Haiti's TPS designation, and in fact were released approximately four months before the announcement of that termination. *See* Decl. of Michael D. Isacco, Jr. dated April 26, 2018

("Isacco Decl.") ¶ 8. Instead, they largely concern Secretary Kelly's decision to extend Haiti's TPS designation in May 2017. *Id.*

### D.      DHS's and State's Productions to Date

On March 22, 2018, State and DHS produced the non-exempt portions of Secretary Tillerson's October 31, 2018, letter to Secretary Duke and the packets of documents reviewed by (1) Secretary Tillerson in advance of sending his October 31, 2017, letter, (2) Secretary Duke before issuing her November 20, 2017, press release, and (3) Deputy Secretary Duke before publishing the January 18, 2018, *Federal Register* notice. Isacco Decl. ¶ 6; Second Declaration of Eric F. Stein dated April 27, 2018 ("Stein Decl.") ¶ 9. As described below, because Secretary Tillerson's letter recommended a proposed course of action to Secretary Duke, State withheld the text of that letter under the deliberative-process privilege. Stein Decl. Ex. 1 at 4. State also withheld action memoranda, draft letters, recommendations, and policy papers that Secretary Tillerson reviewed because those documents contained recommendations about what Secretary Tillerson should propose to Secretary Duke. Stein Decl. Ex. 1. DHS released substantial portions of the packets of information reviewed by Secretary Duke. Isacco Decl. ¶ 7. With respect to the November 20th press release, DHS withheld only portions of a November 3, 2017, decision memorandum prepared by U.S. Citizenship and Immigration Services ("CIS") discussing the options available to Secretary Duke and recommending a proposed course of action. *Id.* With respect to the January 18th *Federal Register* notice, DHS withheld only portions of an attorney-client privileged communication prepared by DHS's Deputy General Counsel. *Id.*

On March 29, 2018, DHS reprocessed the materials previously provided to NILC. *Id.* ¶ 8. While DHS released nineteen additional pages in full, it continued to withhold large portions of the documents—including drafts of a *Federal Register* notice and a report to Congress—under

9

the deliberative-process privilege. *Id.* Ex. 2. Moreover, DHS withheld the names of line-level employees and the contact information of all employees on basis that releasing that information would unduly invade the employees' personal privacy, with no corresponding public benefit. *Id.*

On April 4, 2018, Plaintiffs informed DHS and State that, with two exceptions, they intended to challenge all of the privilege redactions in DHS's and State's productions. The next day, Plaintiffs notified DHS that, in twenty-five instances, they intended to challenge the redaction of line-level employees' names in the March 29th production.

## ARGUMENT

The Court should grant partial summary judgment upholding DHS's and State's privilege and privacy redactions in the productions of March 22nd and 29th. Plaintiffs requested that DHS and State prioritize the processing of information that Secretary Duke considered when exercising the discretion she had under 8 U.S.C. § 1254a(b)(3)(B) to terminate Haiti's TPS designation. By its construction, Plaintiffs' request sought information protected by the deliberative-process privilege: the information Secretary Duke considered "precede[d], in temporal sequence, the 'decision' to which it relate[d]," was "prepared in order to assist an agency decisionmaker in arriving at [her] decision," and constituted part of DHS's process for formulating TPS policy. *See Grand Cent.*, 166 F.3d at 482. Moreover, the memorandum prepared for Deputy Secretary Duke by DHS's Deputy General Counsel is protected by the attorney-client privilege in addition to the deliberative-process privilege. *See In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007). Finally, DHS properly withheld the names of line-level employees because, under Second Circuit precedent, the public's interest in identifying officials of "relatively low rank" is "minimal at best and is insufficient to overcome the employees' interest in preventing the public disclosure of their names." *Wood*, 432 F.3d at 88–89.

10

## I.    FOIA & THE SUMMARY JUDGMENT STANDARD

FOIA generally requires federal agencies to make documents and other material "available to the public," *see* 5 U.S.C. § 552(a), but specifically exempts nine different categories of information from that requirement, *see id.* § 552(b). Congress adopted this structure "to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 89-147 at 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423). The nine exemptions to FOIA's disclosure requirements reflect Congress's determination that "public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166–67 (1985). Accordingly, State and DHS may properly withhold information that falls within any of the nine exemptions. *Id.*

"Summary judgment is the preferred procedural vehicle for resolving FOIA disputes." *Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 649 F. Supp. 2d 262, 271 (S.D.N.Y. 2009). Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When a dispute concerns whether an agency has properly withheld information, the agency can satisfy its burden on a motion for summary judgment by submitting a declaration that gives "reasonably detailed explanations why any withheld documents fall within" one of FOIA's exemptions. *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).[3] An agency's declaration is "accorded a presumption of good faith," and discovery is "unnecessary if the agency's submissions are adequate on their face." *Id.*

---

[3] Because an agency affidavit can satisfy the Government's burden on a motion for summary judgment, "Local Civil Rule 56.1 statements are not required." *N.Y. Times v. Dep't of Justice*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012); *Ferguson v. FBI*, No. 89 Civ. 5071 (RPP), 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995), *aff'd*, 83 F.3d 41 (2d Cir. 1996).

## II.    THE DELIBERATIVE-PROCESS PRIVILEGE PROTECTS INFORMATION GENERATED TO ASSIST THE SECRETARY OF HOMELAND SECURITY IN MAKING DECISIONS ABOUT HAITIAN TPS

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). "By this language, Congress intended to incorporate into the FOIA all the normal civil discovery privileges." *Hopkins v. HUD*, 929 F.2d 81, 84 (2d Cir. 1991). This includes documents protected by "the 'deliberative process' or 'executive' privilege, which protects the decisionmaking processes of the executive branch in order to safeguard the quality and integrity of governmental decisions." *Id.* at 84; *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51 (1975) ("[T]hose who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decision making process." (internal quotation marks omitted)). Exemption 5 protects both "intra-agency" and "inter-agency" records, 5 U.S.C. § 552(b)(5), and treats them identically, *Tigue*, 312 F.3d at 77.

To fall within the deliberative process privilege, an agency record must satisfy two criteria: it "must be both 'predecisional' and 'deliberative.'" *Grand Cent.*, 166 F.3d at 482 (citations omitted). A document is "predecisional" when it "precedes, in temporal sequence, the 'decision' to which it relates," *id.*, and is "prepared in order to assist an agency decisionmaker in arriving at his decision," *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 184 (1975). "A document is 'deliberative' when it is actually . . . related to the process by which policies are formulated." *Grand Cent.*, 166 F.3d at 482 (quotation marks omitted). In determining whether a document is deliberative, courts look to whether the document "formed an important, if not essential, link in [the agency's] consultative process," *id.* at 483, whether it reflects the opinions of the author rather than the policy of the agency, *id.*; *Hopkins*, 929 F.2d at

12

85, and whether it might "reflect inaccurately upon or prematurely disclose the views of [the agency]," *Grand Cent.*, 166 F.3d at 483. Predecisional, deliberative documents include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Tigue*, 312 F.3d at 80 (quotation marks omitted); *Grand Central*, 166 F.3d at 482.

### A. The Information Withheld Under the Deliberative Process Privilege Is Predecisional and Deliberative

Each piece of information State and DHS have withheld under the deliberative-process privilege is both predecisional and deliberative. *Grand Cent.*, 166 F.3d at 482.

1. *Secretary Tillerson's October 31, 2017, Letter and the Underlying Review Packet* — State properly withheld Secretary Tillerson's October 31, 2017, letter under the deliberative-process privilege. Secretary Tillerson did not have the authority to make any decision regarding Haiti's TPS designation, 8 U.S.C. § 1254a(b), and his letter provided only a "recommendation . . . to DHS for its use in making a final determination." Stein Decl. Ex. 1 at 4. The letter is predecisional: Secretary Tillerson prepared it to help Secretary Duke reach a decision, and it preceded Secretary Duke's November 20, 2017, announcement that she had decided to terminate Haiti's TPS designation. *Id.*; *see Grand Cent.*, 166 F.3d at 482. The letter is also deliberative because it "related to the process by which policies are formulated." *Id.* Indeed, § 1254a(b)(3)(A) requires the Secretary of Homeland Security to review TPS designations in "consultation with appropriate agencies." Thus, the statute recognizes that recommendations like Secretary Tillerson's constitute part of the process of making TPS policy.

The same logic applies to each document that State generated to advise Secretary Tillerson about what he should recommend to Secretary Duke. The action memoranda, draft letters, recommendations, and policy papers prepared by Secretary Tillerson's subordinates are

13

predecisional because they were prepared to help Secretary Tillerson decide what to recommend to Secretary Duke, and thus preceded that recommendation. Stein Decl., Ex. 1. Moreover, these documents are deliberative because they constitute "a link in [State's] consultative process," *Grand Cent.*, 166 F.3d at 483, and "reflect the personal opinions of the writer[s] rather than the policy of the agency," *Tigue*, 312 F.3d at 80 (quotation marks omitted); *see also* Stein Decl., Ex. 1. Thus, the Court should uphold State's redactions.

2. *CIS's November 3, 2017, Decision Memorandum* — DHS has also properly withheld portions of the November 3, 2017, Decision Memorandum from the Director of CIS to Secretary Duke. In the portions of that memorandum that DHS has withheld, the Director of CIS discusses "the four options available to the Secretary" with respect to Haiti's TPS designation and makes a recommendation about how to proceed. Isacco Decl. Ex. 1 at 1. The memorandum is "predecisional" because the Director of CIS prepared it for the purpose of assisting Secretary Duke in her decision-making process, and it preceded Secretary Duke's November 20, 2017, announcement that she had decided to terminate Haiti's TPS designation. *Grand Cent.*, 166 F.3d at 482. Moreover, the memorandum is "deliberative" because it constitutes a "link in [the agency's] consultative process," *id.* at 483, consists of "recommendations," and reflects "the personal opinions of the [Director of CIS] rather than the policy of the agency." *Tigue*, 312 F.3d at 80. Accordingly, the Court should uphold DHS's application of Exemption 5.

3. *The Deputy General Counsel's Memorandum* — A similar analysis should lead the Court to permit DHS to withhold a decision memorandum prepared by DHS's Deputy General Counsel to Deputy Secretary Duke on January 2, 2018. The redacted portions of that memorandum contain "recommendations and discussion regarding the Deputy Secretary's authority to publish the TPS decision in the Federal Register, coordination with various entities,

14

and the potential effects of doing so or not." Isacco Decl. Ex. 1 at 2. This memorandum is "predecisional" because DHS's Deputy General Counsel prepared it to help Deputy Secretary Duke make a decision regarding whether and how to publish a *Federal Register* notice, and the memorandum preceded the publication of that notice. The memorandum is also deliberative because, like the November 3, 2017, memorandum, it constitutes a "link in [the agency's] consultative process" prior to publishing the *Federal Register* notice, *Grand Cent.*, 166 F.3d at 483, consists of "recommendations," and reflects "the personal opinions of the [Deputy General Counsel] rather than the policy of the agency." *Tigue*, 312 F.3d at 80 (quotation marks omitted). Thus, the Court should permit DHS to redact this information under Exemption 5.

4. *DHS's March 29, 2018, Production* — Unlike the documents described above, DHS's production of March 29, 2018, did not relate to Secretary Duke's decision to terminate Haiti's TPS designation, and instead largely concerned the May 2017 extension of that designation. Isacco Decl. ¶ 8. The information DHS withheld from that production under Exemption 5, however, is similarly predecisional and deliberative. Four of the documents withheld are "drafts," Isacco Decl. Ex. 2 at 1–2, 4–5, which are predecisional because they precede the final version and deliberative because they constitute one step in the process of producing that final version. *See Tigue*, 312 F.3d at 80 ("Protected by this privilege are . . . draft documents." (internal quotations marks omitted)). The remaining information consists of email exchanges on policy questions such as: (1) how to respond to an inquiry from the Ambassador from Haiti, Isacco Decl. Ex. 2 at 6; (2) on-going discussions between State and DHS, *id.* at 7; (3) steps to take before publishing a *Federal Register* notice, *id.* at 9; and (4) information requested by the Secretary in order to assist him in making his decision regarding TPS for Haiti, *id.* at 14.

These exchanges are predecisional and deliberative because they preceded the formation of DHS's final position and helped to formulate that position. *Grand Cent.* 166 F.3d at 482.

### B. Plaintiffs' Arguments Against the Application of the Deliberative-Process Privilege Fail

Plaintiffs have identified four bases for challenging State's and DHS's invocation of the deliberative process: (1) that the documents may include working law or a change in the standard being applied for TPS determinations; (2) that review of a TPS designation is not a policy decision subject to the deliberative-process privilege; (3) that the documents may include descriptions of facts that do not fall within the scope of the privilege; and (4) that State or DHS may have waived the deliberative-process privilege. Plaintiffs have not provided support for any of these challenges, and each fails.

1. *The Secretaries Did Not Rely on Working Law When Making Decisions About Haitian TPS* — As set forth in the *Federal Register* notices they published, Secretary Kelly and Deputy Secretary Duke made decisions about Haiti's TPS designation based on determinations about whether Haiti met the criteria in § 1254a, and not based on any internal working law. *See, e.g.*, Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. at 2,648. The phrase "working law" describes a category of documents that are neither predecisional nor deliberative because they contain the "reasons for a decision made by an agency, or a policy actually adopted." *Brennan Ctr. for Justice at N.Y.U. Sch. of Law v. U.S. Dep't of Justice*, 697 F.3d 184, 196 (2d Cir. 2012). Under 5 U.S.C. § 552(a)(2), agencies must disclose "final opinions" and "statements of policy and interpretations which have been adopted by the agency and are not published in the *Federal Register*." In determining whether documents constitute an agency's "working law," the Second Circuit considers "whether a withheld document constitutes what FOIA affirmatively requires to be disclosed" under § 552(a)(2), or

16

instead "reflect[s] the agency's group thinking in the process of working out its policy." *Brennan Ctr.*, 697 F.3d at 196, 201.[4] "The public is only marginally concerned with reasons supporting a policy which an agency has rejected, or with reasons which might have supplied, but did not supply, the basis for a policy which was actually adopted on a different ground." *Sears*, 421 U.S. at 152.

Cases considering the "working law" doctrine focus on whether a supposedly deliberative document in fact compelled the decision an agency ultimately made. *Brennan Ctr.*, 697 F.3d at 199–203. In *Sears*, the Supreme Court considered a FOIA request for "Appeals Memoranda" prepared by the NLRB's General Counsel and communicated to Regional Directors. 421 U.S. at 155. The General Counsel had delegated to Regional Directors the power to issue a complaint in response to a charge of unfair labor practices, but subject to a right to appeal if a Regional Director declined to do so. *Id.* at 139–40. In response to any appeal, the General Counsel's office would explain the basis for upholding or reversing the Regional Director's decision in an "Appeals Memorandum." *Id.* at 140–41. The Supreme Court held that Appeals Memoranda that upheld a Regional Director's decision fell outside the scope of Exemption 5 because "the General Counsel has already reached his decision and the Regional Director who receives [it] has no decision to make—he is bound to dismiss the charge." *Id.* at 155. In contrast, Appeals Memoranda that directed a Regional Director to issue a complaint fell within the scope of

---

[4] The doctrine of "working law" is related to, but distinct from that of "express adoption" or "incorporation by reference." *Brennan Ctr.*, 697 F.3d at 198–201. In narrow circumstances, "[a]n agency may be required to disclose a document otherwise entitled to protection under the deliberative process privilege if the agency has chosen 'expressly to adopt or incorporate by reference [a] . . . memorandum previously covered by Exemption 5 in what would otherwise be a final opinion.'" *Nat'l Council of La Raza v. U.S. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (quoting *Sears*, 421 U.S. at 161 (alterations in original)). Express adoption requires a finding that the agency not only expressly adopted the conclusions in an otherwise deliberative document, but also expressly adopted the analysis in the document. *See id.* at 358 ("Mere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference."). Here, the relevant *Federal Register* notices did not expressly adopt the conclusion, much less the analysis, of any deliberative document. *See, e.g., Wood*, 432 F.3d at 84 (no adoption where "[n]either [the endorsing official] nor any other high-level officials made any public references to the . . . [m]emo").

17

Exemption 5 because "the 'law' with respect to these cases will ultimately be made not by the General Counsel but by the Board or the courts." *Id.* at 160. Applying *Sears*, the Second Circuit has held that a memorandum from an official who "lacks authority . . . to make policy decisions" is not "working law" because it neither "bind[s] the agency" nor leaves the decision-maker with "no decision to make." *Brennan Ctr.*, 697 F.3d at 203 (quoting *Sears*, 421 U.S. at 155).

The materials State and DHS have withheld under the deliberative-process privilege do not reflect either agency's "working law." By statute, only one official has authority to terminate or extend TPS designations: the Secretary of Homeland Security. 8 U.S.C. § 1254a(b)(3); *see also* supra note 1. The materials that Deputy Secretary Duke and Secretary Kelly received and reviewed prior to terminating or extending Haiti's TPS designation came from officials who, by statute, "lack[ed] authority" to make decisions about Haiti's TPS designation. *Brennan Ctr.*, 697 F.3d at 203. Thus, those materials neither bound their decisions nor left them with "no decision to make." *Id.* Moreover, the statute required Duke and Kelly to document the "basis for the[ir] determination[s]" in a notice published in the *Federal Register*, 8 U.S.C. § 1254a(b)(3), and both did so, *See* Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. at 2,648; Extension of the Designation of Haiti for Temporary Protected Status, 82 Fed. Reg. at 23,830. As a result, consistent with § 552(a)(2), the public has received DHS's explanations for the Secretaries' decisions regarding Haiti's designation for TPS. Plaintiffs now seek DHS's and State's "group thinking in the process of working out its policy" regarding Haitian TPS. *Brennan Ctr.*, 697 F.3d at 196. But that is precisely what the deliberative-process privilege protects. *Id.*

2. *When Reviewing TPS Designations, the Secretary Interprets a Statue and Formulates Policy* — The Court should also reject Plaintiffs' contention that the review of a TPS designation is not a policy decision subject to the deliberative-process privilege. While Plaintiffs

18

have not identified any authority to support this argument, the Government anticipates that they will rely on *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429 (D.C. Cir. 1992), and its progeny. In *Petroleum Info.*, the D.C. Circuit considered a request for "access to records from a computer data bank containing information on public lands," which largely aggregated information from other publicly available sources. *Id.* at 1431. The Bureau of Land Management ("BLM") argued that, because it had undertaken to improve the data bank, "giving the public the current, provisional . . . file would compromise agency deliberations about the data elements, codes, and format BLM should use in the final version." *Id.* at 1436. The D.C. Circuit rejected that argument, holding that the improvements to the database were "essentially technical and facilitative" and lacked any "association with a significant *policy* decision." *Id.* at 1437.

Review of TPS designations, in contrast, requires interpretation of statutorily enumerated factors, "consultation with appropriate agencies of the Government," and a decision by a cabinet Secretary, which Congress exempted from judicial review. 8 U.S.C. § 1254a(b). The extension or termination of a TPS designation is itself "a significant *policy* decision," and thus far surpasses any requirement of mere "association with" such a decision. *Petroleum Info.*, 976 F.2d at 1437. While Plaintiffs may argue that § 1254a(b) requires the Secretary of Homeland Security to make only factual determinations,[5] the terms of that provision rebut any such suggestion. When reviewing a TPS designation, the Secretary must consider whether a "disruption of living conditions" is "substantial, but temporary," whether a "foreign state is unable, temporarily, to handle adequately the return" of its nationals, and whether permitting aliens to remain in the

---

[5] As a threshold matter, in order to even make such an argument, Plaintiffs must engage in statutory interpretation of § 1254a(b), which is itself a form of policy analysis. *Cf. Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 865–66 (1984) ("[I]t is entirely appropriate for this political branch of the Government to make such *policy* choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities." (emphasis added)). Thus, Plaintiffs' argument falters at the outset, as Plaintiffs' suggestion that the statute requires only factual determinations relies on an implicit policy analysis that the statute reserves for the Secretary of Homeland Security.

United States is "contrary to the national interest." 8 U.S.C. § 1254a(b). These criteria, among others, require not only factual determinations, but also policy judgments about what periods of time qualify as "temporary," which state responses are "adequate[]," and what promotes the "national interest." *Id.* Emphasizing that such considerations entail policy analysis, Congress required the Secretary to consult with "appropriate agencies of the Government" and prohibited judicial review of the Secretary's ultimate determination. *Id.* § 1254a(b)(3)(A) & (5)(A). Moreover, courts have recognized that, even where relevant considerations are factual in nature, that does not prevent discussion of those considerations from implicating policy considerations. *See Urban Air Initiative, Inc. v. EPA*, 271 F. Supp. 3d 241, 261 (D.D.C. 2017) ("[T]he fact that the internal discussions leading up to the final conclusions entailed considerations of scientific principles does not mean that those discussions were not 'deliberative.'").

Concluding that the deliberative-process privilege does not cover factual inquiries required by statute would conflict with decades of Second Circuit law. In 1978, the Second Circuit considered a request for studies that consultants had performed in order to advise the Occupational Safety and Health Administration ("OSHA") about what level of lead exposure was safe in the workplace. *Lead Indus. Assoc. v. OSHA*, 610 F.2d 70, 73–74 (2d Cir. 1979). While the Second Circuit noted that "purely factual material" would not fall within the scope of the deliberative-process privilege, it did not conclude that a scientific analysis of what level of lead was safe in the workplace failed to implicate policy considerations. *Id.* at 85. To the contrary, far from concluding that the presence of factual analysis rendered the deliberative-process privilege inapplicable to OSHA's policy decision, the Second Circuit held that the deliberative-process privilege protected even "factual segments" of the consultants' studies because those segments "would reveal the deliberative process of summarization itself by

20

demonstrating which facts in the massive rule-making record were considered significant by the decisionmaker and those assisting her." *Id.* The Second Circuit noted that disclosing facts that "the agency decided not to rely on" might "facilitate [the requester's] attack on [OSHA's] standards," but concluded that "such disclosure of the internal workings of the agency is exactly what the law forbids." *Id.* at 86. The Court should reach the same conclusion here. To the extent that Plaintiffs intend to argue that the Secretary's consideration of different facts does not fall within the deliberative-process privilege, they are wrong. *Id.* Disclosure of facts that Government officials presented to the Secretary for consideration during the decision-making process is "exactly what the law forbids," *id.*, particularly where the decision at issue is explicitly entrusted to the Secretary and not subject to review. 8 U.S.C. § 1254a(b)(5)(A).

3. *The Withheld Materials Do Not Contain Segregable, Wholly Factual Information* — The Court should also reject any contention that DHS and State must segregate additional factual material from the documents they have produced. Under *Lead Industries*, "[i]f the factual materials are 'inextricably intertwined' with policy making recommendations so that their disclosure would 'compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5' . . . the factual materials themselves fall within the exemption." 610 F.3d at 85 (quoting *EPA v. Mink*, 410 U.S. 73, 92–93 (1973)). That is the situation here.

The documents at issue consist of recommendations about what decision the Secretary of Homeland Security should make regarding Haitian TPS. To the extent that those recommendations discussed facts, they undertook "not merely summary but analysis as well, and as such clearly implicated . . . the deliberative process." *Id.* at 83. The Second Circuit has instructed courts to not simply "pluck[] factual segments" from documents withheld under the deliberative-process privilege, but instead to conduct "a sensitive" analysis of "the relation of the

factual segments to the [document] as a whole." *Id.* at 85. Applying this approach, the Second Circuit held that the deliberative-process privilege protected even "tabular or graphic summaries" prepared to "facilitate understanding." *Id.* Here, the redacted documents consist entirely of recommendations made to the Secretary of Homeland Security and earlier communications, including the Secretary of State, about the appropriate recommendation. The Court must analyze any factual discussion in the context of these documents' broader function. *Id.* Because such discussions analyzed facts in support of the ultimate recommendation—or proposed recommendations—they fall within the scope of the deliberative-process privilege and are not segregable, particularly where officials discussed facts that did not form part of the basis for the Secretary's decision. *See id.* at 86 ("[D]isclosure of the internal workings of the agency is exactly what the law forbids."); *see also Brennan Ctr.*, 697 F.3d at 195 ("[T]he public is only marginally concerned with reasons supporting a policy which an agency has rejected. . . .").

        4. *Courts Have Declined to Recognize Subject-Matter Waiver of the Deliberative-Process Privilege* — Finally, the Court should reject any argument that State or DHS has waived the deliberative-process privilege. A majority of courts have concluded that "[t]here is no subject-matter waiver associated with the deliberative process privilege." *Ford Motor Co. v. United States*, 94 Fed. Cl. 211, 218 (Fed. Cl. 2010); *see also United States v. Wells Fargo Bank, N.A.*, No. 12 Civ. 7527 (JMF), 2015 WL 6395917, at *1 (S.D.N.Y. Oct. 22, 2015) ("[C]ourts have overwhelmingly (if not uniformly) held that the release of a document only waives the *deliberative process* privilege for the document that is specifically released, *and not* for related materials." (internal quotation marks omitted)). The D.C. Circuit has explained:

> [C]ourts have said that release of a document only waives [the deliberative process privilege] for the document or information specifically released, and not for related materials. This limited approach to waiver in the executive privilege context is designed to ensure that agencies do not forgo voluntarily disclosing

some privileged material out of the fear that by doing so they are exposing other, more sensitive documents.

*In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (citations omitted). Here, Plaintiffs have provided no evidence that DHS and State have previously released the documents and information now withheld under the deliberative-process privilege. Accordingly, DHS and State have not waived that privilege.

**III.    THE ATTORNEY-CLIENT PRIVILEGE PROTECTS THE MEMORANDUM FROM DHS'S DEPUTY GENERAL COUNSEL TO THE DEPUTY SECRETARY**

Exemption 5 also encompasses the attorney-client privilege. *See, e.g.*, *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005). The purpose of the attorney-client privilege "is to encourage attorneys and their clients to communicate fully and frankly and thereby to promote broader public interests in the observance of law and administration of justice." *Erie*, 473 F.3d at 418 (internal quotation marks omitted). To invoke the attorney-client privilege, a party must demonstrate that there was: "(1) a communication between client and counsel, that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Id.* at 419. "In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (2d Cir. 1997). Indeed, "the traditional rationale for the [attorney-client] privilege applies with special force in the government context. It is crucial that government officials, who are expected to uphold and execute the law . . . be encouraged to seek out and receive fully informed legal advice." *Erie*, 473 F.3d at 419.

Here, the attorney-client privilege protects the January 2, 2018, memorandum from DHS's Deputy General Counsel to Deputy Secretary Duke, thus providing an additional basis beyond the deliberative-process privilege for withholding portions of that memo under

23

Exemption 5. On its face, the memo is a communication between DHS counsel and an agency official, who qualifies as a client. *Tax Analysts*, 117 F.3d at 618. Moreover, DHS's *Vaughn* index explains that the memorandum provided "legal advice regarding the publication in the *Federal Register* of the Secretary's decision to terminate the designation of Haiti for Temporary Protected Status," including counsel's "analysis of the issue, discussion of Component comments, discussion of whether coordination with OMB was recommended, and legal recommendations to the Deputy Secretary." *See* Isacco Decl. Ex. 1 at 2. Finally, the parties intended to and in fact kept the memorandum confidential, as indicated by the fact that they marked it "Attorney-Client Privileged Communication." *Id.* Accordingly, the memorandum meets all three requirements for the application of the attorney-client privilege, and the Court should uphold DHS's decision to withhold it under Exemption 5.

## IV.   EXEMPTION 6 PROTECTS LINE-LEVEL EMPLOYEES' NAMES FROM DISCLOSURE

Finally, the Court should reject Plaintiffs' challenge to DHS's redaction of line-level employees' names under Exemption 6. That exemption allows agencies to withhold "personnel and medical files and similar files" whenever "disclosure . . . would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). To determine whether a file qualifies as "similar" to "personnel and medical files," courts examine whether information in that file "applies to a particular individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 601–02 (1982); *see also Wood*, 432 F.3d at 87. If the threshold requirement is met, courts next "balance the public need for the information against the individual's privacy interest in order to assess whether disclosure would constitute a clearly unwarranted invasion of personal privacy." *AP v. U.S. Dep't of Def.*, 554 F.3d 274, 291 (2d Cir. 2009). Courts examine the "public need for the information" in light of "the basic purpose of [FOIA] to open agency action to the light of

24

public scrutiny, rather than . . . the particular purpose for which the document is being requested." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 772 (1989) (internal quotation marks and citations omitted). "In determining the public's interest in disclosure of a government employee's identity," the Second Circuit looks at "the employee's rank and whether the information sought sheds light on government activity." *Wood*, 432 F.3d at 88. "[T]he public's interest in knowing the identities of the employees assigned to investigate [an issue] is minimal at best and is insufficient to overcome the employees' interest in preventing the public disclosure of their names." *Id.* at 89.

Here, the privacy interest of line-level DHS employees in having their names withheld far outweighs the "minimal" public interest in knowing their identities. A person's name "applies to [that] particular individual," and thus satisfies the threshold criterion for applying Exemption 6. *Wash. Post*, 456 U.S. at 602. Moreover, as set forth in DHS's *Vaughn* index, disclosing the potential association of line-level employees with TPS decisions, a "controversial aspect of immigration policy, would potentially subject them to harassment . . . simply for performing their jobs as ordered." Isacco Decl. Ex. 2. This is the precise interest that the Second Circuit recognized and enforced in *Wood*. 432 F.3d at 88. Finally, because the employees at issue are of "relatively low rank" and the "outcome" of the TPS decision has been publicly explained by the Secretary of Homeland Security in the *Federal Register*, the "public's interest in knowing identities of the employees . . . is minimal at best and insufficient to overcome the employees' interest in preventing the public disclosure of their names." *Id.* at 89. Accordingly, the Court should uphold the redaction of line-level employee names under Exemption 6.

## **CONCLUSION**

For all of the reasons stated herein, the Government respectfully requests that the Court grant partial summary judgment in favor of DHS and State on withholdings from the documents produced on March 22 & 29, 2018.

Dated: April 27, 2018
New York, New York

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:     */s/ Caleb Hayes-Deats*
CALEB HAYES-DEATS
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2699
Fax: (212) 637-2686
caleb.hayes-deats@usdoj.gov

26