I45BNAT1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NATIONAL IMMIGRATION PROJECT
OF THE NATIONAL LAWYERS GUILD,
et al.,

                Plaintiffs,

         v.                        18 Civ. 659 (RA)

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,
                                   Conference
                Defendant.

------------------------------x
                                   New York, N.Y.
                                   April 5, 2018
                                   5:15 p.m.

Before:

                    HON. RONNIE ABRAMS,

                                   District Judge

                       APPEARANCES

WASHINGTON SQUARE LEGAL SERVICES,INC.
     Attorneys for Plaintiffs
BY:  NANCY MORAWETZ
BY:  JESSICA ROFE

GEOFFREY S. BERMAN
     Interim United States Attorney for the
     Southern District of New York
CALEB HAYES-DEATS
     Assistant United States Attorney


Also Present:  Fatima Carrillo, Intern
               Kevin Siegel, Intern
               Nora Searle, Intern

I45BNAT1

(Case called)

MS. CARRILLO:  My name is Fatima Carrillo, NYU law student on behalf of National Immigration Project.  With me are colleagues Nora Searle, Kevin Siegel, as well as our supervising attorneys, Nancy Morawetz and Jessica Rofe.

THE COURT:  Good evening all.

MR. HAYES-DEATS:  Good evening, your Honor.  Caleb Hayes-Deats for the defendants.

THE COURT:  Good evening to you as well.

I have your letters concerning the production schedule, expedited processing, and exceptional circumstances.  I also see that the parties have agreed on a summary judgment briefing schedule on the withholdings.  The final brief will be submitted June 7.

Is that right?

MR. HAYES-DEATS:  That's correct, your Honor.

THE COURT:  I'm going to adopt that schedule.

Have there been any further discussions or agreements on the production schedule since your letter?

MS. CARRILLO:  Your Honor, unfortunately we have not reached an agreement on the production schedule.  We have also not reached an agreement on the prioritization with DHS.  Our understanding from the last negotiation was, in order to prioritize with DHS, we were required to also narrow our request.  This agreement on the production schedule is

I45BNAT1

plaintiffs are requesting a processing schedule of 1500 pages per week, whereas defendants have asked for a production schedule of 500 pages per month. The way that we arrived, your Honor, if I may, at the 1500 pages per week is for two reasons, your Honor.

The first is that this 1500-pages-per-week schedule would allow us to obtain the documents in time for the congressional session in September.

THE COURT: Why do you need to go back so far in time? Do you really need all of those documents? I can understand the desire to have documents by that time, but isn't there a way to narrow the scope of what you're asking for to make that more reasonable?

MS. CARRILLO: Your Honor, the documents that we're seeking at this point are almost strictly for just the one year which the TPS destination, or rather the termination was made, which is 2017. We have narrowed our request by about 87 percent of the time frame, and strictly leaving it at the year of 2017.

THE COURT: Is that right? I thought you were going back to 2010.

MS. CARRILLO: So that was in the original request. We're only requesting documents that date back to 2010, that are strictly the packets that went to the secretary of DHS, the secretary of state, and the director of CIS. Those are very

I45BNAT1

specific packets, but that's it.

As far as the requests that we have now, which is what we negotiated with defendants, is strictly about 2017 and that is what we are trying to get a schedule for, which would allow us to obtain documents before the cancellation of TPS in July 2019.

THE COURT:  I have one more question, which is it seems like there is a slight disconnect between the parties on whether the schedule should be based on production or processing and I saw the government had a footnote about this issue.  Do you want to tell me your thoughts on that?

MS. CARRILLO:  Absolutely, your Honor.

If I may explain this a little bit further.  So processing -- or rather, expedited processing, is really about the agency level.  Plaintiffs asked for expedited processing at the agency when they file their FOIA request.

What that means under the statute is that the agencies process the FOIA request, in general, in 10 days as opposed to 20 days.  That means answering the FOIA request stating how many hits there are.  The agencies failed to do that in this case.  They never made a determination on the expedited processing.

Then in the March 16 letter -- or really to support that we do not merit accelerated production schedule at the litigation stage, the defendants raised this issue, despite the

I45BNAT1

fact that they never made a determination.  We responded in our March 23 letter saying that even at the agency level, we raised an issue about the urgency of these documents and the reason why we needed expedited processing in 10 days as opposed to 20 days, but we're no longer at that stage, your Honor.  We're at a stage that what we really is not a production schedule that would be accelerated, because we're no longer asking for the FOIA request to be processed in 10 days as opposed to 20 days, given that the agencies do not reply to that.

THE COURT:  So the expedited processing test set forth in the DC circuit, is that not something you're asking me to analyze now, that really only relates to the 10 versus the 20 days?

MS. CARRILLO:  So the processing schedule would certainly provide support for setting an accelerated production schedule, but those two stages are separate and apart, your Honor.

If I may point to two examples.  There are two cases in which the plaintiffs had not even raised expedited processing at the agency level, and yet the court at the litigation, irrespective on that, decided that based on the urgency of those documents and the need to obtain those documents in a limited time frame, the Court ordered an accelerated production schedule and -- give me one second, your Honor -- that is *Cause of Action Institute v. States*, and

I45BNAT1

*Greenberger v. IRS.*  I apologize for that, your Honor.

In those two cases, the plaintiffs did not raise expedited processing at the agency level but at the stage of litigation, which was a separate stage of where they were at the agency level.  The plaintiffs in those cases raised urgency concerns about obtaining the documents in a very specific period of time, such that the documents would factor into the public debate.  For those reasons the Court analyzed those arguments and set out an accelerated production schedule, which really demonstrates, your Honor, that the Court has an inherent power despite any determinations as to expedited processing to set an accelerated production schedule.

This case, your Honor, merits that, because one, we are four months after we have asked for the FOIA request. We're four months after the FOIA request was made, and in that time we have obtained strictly the documents that have been ordered by the Court.  We have lost a lot of time and TPS for Haiti is set to expire or terminate in July 2019.

In that time, the public is very interested and concerned about those people who have been affected.  At least 58,000 Haitian TPS holders who will be affected in that timeline and there's also legislative proposals that are being considered in the House and the Senate that will take into account reasons under which TPS were terminated and perhaps take steps to protect the TPS holders who will have to make

I45BNAT1

life-changing decisions in the next few months.

THE COURT:  Thank you very much.

Do you want to respond, Mr. Hayes-Deats?

MR. HAYES-DEATS:  Yes, your Honor.  Thank you.

I want to start with the difference -- well, let me take a step back and describe what's happened since we were last together.  The agencies on March 22 produced the briefing packets that plaintiffs asked to us prioritize.  On March 29 DHS produced the records that had been previously been produced to a different FOIA requester.  In doing so, and in rereviewing the documents, DHS produced 19 additional pages in full that it had previously withheld in full.

This example shows that when we have the time to review upfront, we can make more thoughtful determinations about how the law applies and what's really worth litigating over and that actually results in getting plaintiffs' information quicker and avoiding disputes that would otherwise be presented to your Honor.

So we think that it's important to have a schedule that allows us to conduct that kind of thoughtful methodical review in order to really get information to plaintiffs quicker in many instances and also to avoid a number of disputes coming before the Court that don't otherwise need to be here.

THE COURT:  I understand that, and in the normal course that would make a lot of sense.  I think the concern

I45BNAT1

here is that you do have these impending deportation, or at least forced departures affecting tens of thousands people in July because the TPS termination and the uncertainty that entails.  Then you have this ongoing legislative, legal, and public debates about the termination, and if this material once it's disseminated may help inform the players on those legislative, legal, and public debates, there is a pressing time need for this.  There is a pressing time concern that's not present in a lot of FOIA cases.

The question is, how do we balance that with the need for you all to do your job, to do it well, and recognizing that there are all these additional FOIA requests this year.  There are a lot of staff positions that haven't been filled.  So that's really the question and I think the schedule that you've proposed just won't get plaintiff what it needs in a time to make it useful.

MR. HAYES-DEATS:  Your Honor, I agree that FOIA requires to us make tough decisions and it actually provides a lot of guidance on how to make those decisions through the request that it specifically instructs agencies to process on an expedited basis.

THE COURT:  I do think that there is a basis here for expedited processing.  To the extent that that standard no longer applies, I'm not going to read a ruling on expedited processing, but I do think that the test has been met here that

I45BNAT1

was set forth by the DC circuit.

MR. HAYES-DEATS:  Your Honor, if I might say one more thing.

THE COURT:  Yes.

MR. HAYES-DEATS:  We can get plaintiffs a lot of information on the schedule that we proposed, within the timeline that they've outlined, which is in advance of the September 2019 legislative session.  We can produce at a rate of 500 pages per month --

THE COURT:  But this ends in July 2019, right, the program as I understand it.  So many of the people will have already have been deported or forced departure by that time. Is that the only time for the litigation, building in time for my decision?

MR. HAYES-DEATS:  Your Honor, let me back up.  I referred to September 2019 legislative session, because that's what Ms. Carrillo just referred to.

THE COURT:  Are you talking about September 2019?

MS. CARRILLO:  So TPS will terminate in July 2019.

THE COURT:  OK.

MS. CARRILLO:  Given the interest and proposals in congress to review any legislative proposals, we're asking for a timeline of September 2018.

THE COURT:  2018.  That makes much more sense.

MR. HAYES-DEATS:  I'm sorry.  I misunderstood.  I

I45BNAT1

thought it was actually in their letter that it was 2019, but I would point out that even their requested schedule won't get more than half of the documents from State produced by September of 2018.

But I also want to point out to your Honor that the reason that we have so many documents here that need to be reviewed is because of the breadth of plaintiffs' requests. I think there's a real disconnect between plaintiffs' requests as currently framed and what they say they need. Plaintiffs have asked for communications and recommendations from every employee of four different agencies. There is no credible suggestion that recommendations from low-level people in CIS from the International Humanitarian Affairs Division can be used to lobby Congress.

(Continued on next page)

I45AANAT2                     Conference

MR. HAYES-DEATS:  So F.O.I.A actually requires there to be a very tight and virtual chain between the requests and the imminent action that that request is going to address. Here, we don't have that at all.  The justifications that plaintiffs have identified and the events that they've identified as of potential interest are only a tiny fraction of what we've requested through F.O.I.A.  So if they would simply narrow their request, we might be able to work out a timeline that got them information on a much shorter timeline in order to allow them to do what they want.

THE COURT:  All right.  So I'm going to tell you this. I'm going to tell you and I'm going to ask you to go back and talk to each other and you can write me a letter as early as tomorrow.  I know you want a decision quickly.

I am going to require a bigger production than the government proposed.  It's not going to be quite as big as was asked for but I do think it should be significantly more than what the government has proposed.  That being said, it does seem that you are not going get all the information you need even on that schedule in the time you want.  So I am going to ask plaintiffs to go back and think about how to narrow your, either narrow or prioritize in terms of the timing.  I know of you've done that already and you've started that process but to go back and think, what do I really need and how fast can I get that?  And then work out a schedule on whether it's we're

I45AANAT2                    Conference

basing it on processing or paper produced based on what we really need.

MS. CARRILLO:  Thank you, your Honor.

We are happy to prioritize the work with the agencies that require advertisement.  The difference between DHS and DOS is that with DOS we've reach an agreement on prioritizing.  So even though defendants are raising that there was a larger hit that would allow us to obtain all of the documents in that time, we are still prioritizing and so that will help us really to inform the public and inform any legislative proposal.

On DHS we have not reached an agreement on prioritization because defendants wanted us to narrow.  In the second production that we received we received documents that really showed that narrowing could potentially jeopardize losing some of those documents that are squarely within what we need and it would really inform the public about the grounds in which TPS were made.

We are happy to negotiate further.  We would just urge the Court that this is again, on a very limited time schedule and we're happy to do that.

THE COURT:  If you submit a letter to me by tomorrow, that's fine.  I am just concerned that you are not going to get what you need in time.  So I'm trying to as I said, I do think there's a basis for expedited processing in light of those who recently requested it.  I ultimately believe that even though

I45AANAT2                    Conference

the immigration process is not a media entity that it's clear from the projects missions statement that sharing information with the public and with other groups and practitioners is the core part of the organization's function.  And as a result, I think you're eligible for expedited processing.

Again, it may be that that standard of expedited processing is no longer relevant here but whether it's expedited processing or expedited production, I do think you are entitled to it.  But I want to be realistic.  Is there it not a way to work with plaintiffs so, again, we're focusing with all the agencies on prioritizing what's most important without them having to narrow permanently?

MR. HAYES-DEATS:  Your Honor, for two of the three agencies we actually have already reached agreement on prioritization.

THE COURT:  So what's the problem?

MR. HAYES-DEATS:  So with DHS in order to get a page count that we could present to your Honor at the last conference, they uploaded the documents into the system that they used for processing and they can't undo that.  And the documents are in that system and are not in the order the plaintiffs wanted.  So in order to prioritize, DHS would actually have to redo its entire search which would take ten days.

Now we support redoing that and trying to prioritize

but we would also like for plaintiffs to narrow when we do that because we think that that will aid DHS significantly going down the line.

THE COURT:  If you're not willing to narrow permanently but are willing to prioritize this, is there no way to figure that out?

MR. HAYES-DEATS:  Your Honor, I'm somewhat limited in my standing of this.  But in order to prioritize in the manner the plaintiffs have asked, DHS would actually have to run two different searches or multiple searches.  And the problem with doing that is the system DHS uses de-duplicates documents.  If you run multiple searches, those searches with will not de-duplicate against each other.  So you'll actually end up with a larger number of pages because the same pages will be in two different review queues.

THE COURT:  If that's the state of affairs would your preference still be for them to run two searches even if the search second is duplicative and you would get the same stuff twice on the second search.  But the first one would be narrower.  Sounds like it'll take ten days to run it but you could have two different searches, one that's narrower and one that's what you want now that encompasses what you already got. Am I understanding it correctly?

MR. HAYES-DEATS:  Yes.

THE COURT:  It seems like it would be in interest to

I45AANAT2                     Conference

do that.  But why don't you think about that overnight and write me a letter tomorrow.  As I said, I'm not going to make the government do more than three hundred pages a month.  I just don't think that's sufficient.

MR. HAYES-DEATS:  I understand, your Honor.

If I could, I'd like to address the schedule the plaintiffs have requested because I do think it falls far outside the form.  They've requested that we produce or process six thousand pages per month.  Even if you look at the cases that they have cited, only four of those cases support even half of that request.  And I can address all four of those but let me just start with the Greenberger case that Ms. Carillo just referenced.

So in Greenberger it is correct that the IRS processed approximately 27,000 pages in four months, but what's been left to out is that the IRS actually only produced 1100 of those pages.  The only 2600 pages were withheld in full under exemption three and excerpt 7A.  So it doesn't support what plaintiffs have asked for here which is the redaction and processing of thousands of pages per month.  At the most it supports hundreds of pages her month.

THE COURT:  Some of the cases support somewhere between a thousand and two thousand pages per month.

MR. HAYES-DEATS:  There are some cases like that.  The ones the plaintiffs have cited, five of them approximately,

relate to records in connection, records sought from state and specifically Secretary Clinton in 2015 and 2016 when she was candidate for president.  So we would submit that those cases are absolutely distinguishable because in those cases you had an imminent action in the form of a presidential election and you had information that could be provided to voters.

Here, even though there's the termination of TPS in a year, the connection with the information is much more limited. Plaintiffs say that they want to use this to lobby the legislature as part of an ongoing process but there's no indication that the legislature's view will be influenced in any way by any employee of the state or CIS or DHS's recommendations or communications about the very law that the legislature would be amending.

THE COURT:  In each situation while the -- purposes that plaintiffs used to seek to use the information for is somewhat distinguishable.  You know, you have a built in deadline in both in terms of why and how plaintiffs intend to use the information.  And if they don't get the information in time, it's really not something that they could utilized at all.  It's not like this is the New York Times or a writer who wants to write a book but gets put off for six months or a year.  It can still be written.  There still is an impending deadline.  The question is, how can you get plaintiffs what they really need in the time when they can use it?

MR. HAYES-DEATS:  That's true, your Honor.  But I would focus on the last thing your Honor said.  How can get plaintiffs what they really need?  F.O.I.A requires in order to obtain extradited processing that a requester has to show and a special interest of the specific subject of their F.O.I.A and right as currently defined, that is any communication or recommendation about Haitian TPS from any employee of state DHS or CIS.

THE COURT:  Is there a way to narrow the number of people within the --

MS. CARRILLO:  Your Honor, the reason why the F.O.I.A requests any employee is because we are outsiders to the agencies.  We don't have a full list of people who specifically participated in the recommendations and the terminations to terminate TPS.  We state that.  And the agencies have a list or have a sense of who within their staff worked on the termination of TPS.

So our request doesn't say you, DHS, CIS, DOS search for all your employees.  We're saying the agency has that knowledge of who worked on those cases and who worked on making a determination and they can search those people.  In fact, defendants have told us that for some of the cases -- excuse me -- for some of the agencies they will be tasking the search.  And that means that they will notify their employees that they should look for documents that pertain to the termination of

I45AANAT2                    Conference

Haiti's TPS.  And those staff members know that they worked on that.

So our request is being depicted as something that is so broad but it really isn't.  As outsiders we can give a specific number of people who worked on that because we simply do not have that information.

THE COURT:  How can you help them figure out who the people are that would have this information and perhaps limit it?

MR. HAYES-DEATS:  Your Honor, we've actually disclosed all of the custodians used to generate the page totals that are now before your Honor, at the very least disclose their offices.  So they do know the office that worked on this.  And we haven't searched offices that didn't work on this, for example, because we didn't think they would be reasonable likely to have responsive documents.

But, your Honor, just because a line level employee worked on this in some capacity does not mean that they are going to have information that will be relevant to the ongoing debates that plaintiffs claim that they want to participate in.

THE COURT:  Well, what information can you provide tell about who has the relevant information?

MR. HAYES-DEATS:  Your Honor, plaintiffs well know, if you look at plaintiffs' complaint, if you look at the letter they submitted it is quite clear that they have studied the

I45AANAT2                    Conference

media on determination of Haitian TPS extensively.  And what it show is one person made the decision, the ultimate decision to terminate TPS for Haiti.  And that's the secretary of TPS.  She got recommendations from the director of CIS and from Rex Tillerson, the Secretary of State at the time.

So there are three people who were at the top of this line that really engaged in significant deliberative process that plaintiffs claim that they want to -- the people below them have at best suggestions that the ultimate decision makers may have rejected.

And I would point out to your Honor that I don't think those are relevant to any legislator and this is the heart of what F.O.I.A protects.  There's a case from 1976 where Judge Friendly says -- and I just want to quote this because I think captures this and the application of deliberate process quite well.  It might indeed facilitate the requester's attack on the standards if it -- and in just what respects the assistant secretary departed from the staff reports she had before her.  But such disclose of the internal workings of the agency is exactly what the law forbids.

THE COURT:  All right.  So if I understand your point is that they'll never really get what they really want.

MR. HAYES-DEATS:  They are not going to get these documents.  F.O.I.A does not require the agencies to release this information.  And really the only things that could be

relevant to this ongoing debate are the decisions made by those top three employees that I just cited to your Honor.

MS. CARRILLO:  Your Honor, if I may, I can provide an example to the why what defendant is saying is not entirely true.  And that is because in the second production that we received on March 29 which is a set of production that was sent to us, there is an e-mail, your Honor, that was sent on April 18.  The "sent" line, your Honor, was redacted as a B6 exemption.  From what the agencies have told us, the redaction is due to the fact that this person is a low-level employee or someone who is not necessarily a decision maker.

On April 18th at 9:54 there was a notice, a summary notice that was sent out that said that TPS for Haiti would be extended for 18 months.  That same day, your Honor, in a following e-mail at two p.m., four hours later, there was a change and that was the new notice now read that TPS for Haiti would be terminated.

That e-mail exchange came in a set of very heavily redacted set of documents and yet we were able to find this information from an employee who is considered by the agencies a low-level employee.  This information is key to what we're looking for and understanding how this decision for terminating TPS for Haiti was made and yet it came from a low-level employee.

This really showed us, your Honor, that some of this

information that we're were looking for may very well come from these low-level employees and we would be missing that if we narrowed it to these --

THE COURT:  I'm sorry.  I missed what the information was.  I understand that there was a decision made about the change in the policy and the interrupt and change in policy but what is it that you feel could be learned from these low-level employees that was relevant?

MS. CARRILLO:  The information that we would learn is that in a four hour period there is a huge change in whether or not TPS for Haiti would merit an extension.  It's a four hour change in which it went from -- extend TPS for Haiti or 18 months to four hours later we would terminate TPS for Haiti. And in understanding that decision I think it highlights how that decision was made.

There's also another document that we received that was sent to Secretary Tillerson that states, your Honor, the country reports have been edited according to your decision and will be forward to DHS per your decision.  This is also an e-mail -- excuse me -- a memo that was included in a heavily redacted set of documents and yet we were able to obtain these documents from the request that we had made.  It doesn't necessarily come from these high-level employees or even just the secretaries that are making these decisions.  The information that we're looking for could come from the low

I45AANAT2                    Conference

level employees and understanding how the decision was made.

THE COURT:  Due to the fact that the policy was changed in a four hour window, the decision to make the change in a four hour window, how is that something you're going to use to educate the public or how would that inform the legislation or anything that would be useful?

MS. CARRILLO:  That, your Honor, is one example that highlights that there was a change in standard which is important to note because the statute requires that the conditions in Haiti be reviewed.  And if there is a standard by which that was made, a standard that was later changed and then was applied to the TPS holders who already had status, that is something that the public needs to know and the public needs to understand how that decision was made.

THE COURT:  All right.  So look, I am going to ask you one more time.  I know you need an answer and I can give it to you promptly but I'm not going to grant either of your requests in full.  I think the answer is somewhere in the middle.  I think it's more than the government has proposed.  I think what plaintiffs are asking for is unduly burdensome.  And so the question is is there a way to further narrow or prioritize or do something so you can get what you really need and get it litigated in the timeframe you have?

MS. CARRILLO:  There is way, your Honor, to prioritize and renegotiate.  And that would I think also affect the rate

I45AANAT2                    Conference

of production that we are requiring.  We certainly were hoping to receive the documents such that they could factor into the public debate and also the legislator proposals.  But I think that if we are negotiating on actually prioritizing and not narrowing in terms of DHS, I think that that would also affect the rate and production.

THE COURT:  I understand that with respect to -- DHS too narrow.  But right now plaintiff is not agreeing to that.  So let's just work on prioritization because otherwise the government may be in a position where it has to produce even more documents on an ongoing basis.

MR. HAYES-DEATS:  I understand that, your Honor.  For the reasons I've described it will be impossible for DHS to prioritize in the manner the plaintiffs have requested without redoing their search.  If plaintiffs are open to DHS redoing their search --

THE COURT:  Then you'll have to make that determination and concede that you are willing to wait an extra ten-day period.

MR. HAYES-DEATS:  Your Honor, one other thing?

THE COURT:  Sure.

MR. HAYES-DEATS:  I'm actually going to Texas tomorrow through Monday because my little sister just had a baby, so I will not be in a position to submit a letter to your Honor tomorrow, could we potentially postpone that until next week so

I45AANAT2                    Conference

time?

MS. CARRILLO:  One second, your Honor?

THE COURT:  Yes.  Do you want to use the courtroom now to talk amongst yourselves for a while?

MS. CARRILLO:  We would appreciate that, your Honor.

MR. HAYES-DEATS:  I am available, yes.

THE COURT:  OK.  So I'll be back in the robing room. Why don't you talk amongst yourselves.  Talk to each other and see if there is something you can do to move this forward a little bit and then just let me know when you are ready to see me again.

(Adjourned)