**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATED DEPARTMENT OF STATE, UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, and UNITED STATES CITIZENSHIP, <br><br> Defendants. | No. 18 Civ. 659 (RA) |

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**</u>
<u>**MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF**</u>
<u>**PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

Nancy Morawetz
Jessica Rofé
Fatima Carrillo Moran, Legal Intern
Nora Searle, Legal Intern
Kevin Siegel, Legal Intern
WASHINGTON SQUARE LEGAL
SERVICES, INC.
245 Sullivan Street, 5th Floor
New York, NY 10012
(212) 992-7245
nancy.morawetz@nyu.edu
jessica.rofe@nyu.edu
*Attorneys for Plaintiffs*

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ..................................................................................................................... 2

  A.   Congress Passed TPS in Order to Provide Clear Criteria for Designating, Extending, and
      Terminating Country-Specific "Safe Havens," Replacing a Previous Program That
      Lacked Any Meaningful Standard. ................................................................................. 2

  B.   In 2017, USCIS Terminated TPS for 98% of Beneficiaries, Including 58,000 Haitians,
      After Publicly Indicating Its Plan To Set a Time Limit On TPS Designations ................ 5

  C.   Both the March 22 and the March 29 productions by DHS and DOS raise what a group of
      twelve U.S. Senators have called "serious questions about the integrity of [DHS']
      justification for terminating [TPS] for Haiti." ................................................................. 8

ARGUMENT ......................................................................................................................... 8

  I.   The Government Bears a Heavy Burden When Withholding Documents Related to the
      Termination of TPS ........................................................................................................ 8

    A.   The Deliberative Process Privilege Does Not Protect Hidden Agency Interpretations
        and Efforts to Obscure and/or Justify an Already-Made Decision .............................. 9

    B.   Reasonably Segregable Factual Material is Not Protected by the Deliberative Process
        Privilege .................................................................................................................. 13

  II.   The Government Has Not Met Its Burden With Respect to the Documents It Seeks to
       Withhold. ..................................................................................................................... 14

    A.   The Emails and Documents Produced by DHS on March 29, 2018 Do Not Warrant
        Redaction Because They Are Post-Decisional  and May Also Contain Agency
        "Working Law" and/or Factual Material ..................................................................... 14

      i.   Emails Regarding "Discussions" about the Termination of TPS for Haiti Are Not
          Subject to the Deliberative Process Privilege ........................................................ 14

      ii.   The April 2017 Draft Regulatory Action Has Been Improperly Withheld by DHS
          Because It Does Not Involve a Policy Decision And Likely Contains Factual
          Material ................................................................................................................ 15

      iii.   The Deliberative Process Privilege Cannot Apply to the Calendar Year 2016
          Report on TPS Because It Does Not Involve a Decision-Making Process and, to the
          Extent That it Lays Out an Overall Approach to TPS and/or Discusses Facts, That
          Material Must Also Be Disclosed .......................................................................... 17

      iv.   Documents Such As a Drafted Letter to a Congressperson, a Response to an
          Inquiry from the Haitian Ambassador, and Public Affairs Guidance from DOS,
          Prepared in Order to Explain an Existing Decision to the Public, Are Not Protected
          by The Deliberative Process Privilege .................................................................. 18

    B.   The Packets Produced by DHS and DOS on March 22, 2018 Are Not Subject to
        Exemption 5 Because These Documents Were Not Part of a Deliberative Process,

But Rather Were Created in an Attempt to Justify a Decision to Dismantle TPS that Had Already Been Reached. .................................................................................. 19

i.   The Letter from Secretary Tillerson, Action Memos, Policy Papers, and Country Specific Materials Withheld by DOS and DHS Are Post-Decisional and Likely Contain Factual Material, And Therefore Are Not Privileged. ............................. 19

ii.  January 2, 2018 DHS Decision Memo Cannot be Withheld Because it is not Pre-Decisional and, Additionally, Attorney-Client Privilege Does Not Apply When the Material in Question Does Not Constitute Legal Advice, ..................................... 22

III.  Defendants' Use of Exemption 6 is Overbroad and Fails to Serve the Exemption's Purpose .................................................................................................................. 24

## **TABLE OF AUTHORITIES**

### CASES

*100Reporters LLC v. DOJ*,
    823 F.2d 574 (D.D.C. 2017) ................................................................................................17

*ACLU v. DOD*,
    2017 WL 4326524 (S.D.N.Y. Sept. 27, 2017)....................................................................9

*Allocco Recycling, Ltd. v. Doherty*,
    220 F.R.D. 407 (S.D.N.Y. 2004) .......................................................................................17

*Am. Civil Liberties Union Found. v. United States Dep't of Justice*,
    833 F. Supp. 399 (S.D.N.Y. 1993) ....................................................................................22

*AP v. DOD*,
    554 F.3d 274 (2d Cir. 2009)...............................................................................................25

*Berkovitz by Berkovitz v. US*,
    486 U.S. 531 (1988).............................................................................................................11

*Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. United States DOJ*,
    697 F.3d 184 (2d Cir. 2012).......................................................................................9, 12, 18

*Charles v. City of New York*,
    2011 WL 5838478 (E.D.N.Y. Nov. 18, 2011)....................................................................20

*Coastal States Gas Corp. v. Dep't of Energy*,
    617 F.2d 854 (D.C. Cir. 1980) ...............................................................................20, 21, 22

*Conservation Force v. Jewell*,
    66 F. Supp. 3d 46 (D.D.C. 2014) ......................................................................................16

*Ctr. for Biological Diversity v. EPA*,
    279 F. Supp. 3d 121 (D.D.C. 2017) ....................................................................................4

*Dep't of the Air Force v. Rose*,
    425 U.S. 352 (1976)..............................................................................................................1

*DOI v. Klamath Water Users Protective Ass'n*,
    532 U.S. 1 (2001)...........................................................................................................12, 22

*Elec. Frontier Found. v. United States DOJ*,
    739 F.3d 1 (D.C. Cir. 2014) .................................................................................................9

*EPA v. Mink*,
  410 U.S. 73 (1973)........................................................................................13

*Families for Freedom v. U.S. Customs & Border Prot.*,
  797 F. Supp. 2d 375 (S.D.N.Y. 2011).........................................................25

*Fox News Network, LLC v. U.S. Dep't of Treasury*,
  911 F. Supp. 2d 261 (S.D.N.Y. 2012)..........................................17, 19, 22, 23

*Grand Cent. P'ship, Inc. v. Cuomo*,
  166 F.3d 473 (2d Cir. 1999)..................................................................9, 14

*Hall & Assocs. v. EPA*,
  846 F. Supp. 2d 231 (D.D.C. 2012) .........................................................10, 24

*Heartland Alliance v. DHS*,
  291 F. Supp. 3d 69 (D.D.C. 2018) ................................................................17

*Hopkins v. U.S. Dep't of Housing & Urb. Dev.*,
  929 F.2d 81 (2d Cir. 1991)..........................................................................14

*Jordan v. DOJ*,
  591 F.2d 753 (D.C. Cir. 1978) .....................................................................16

*Judicial Watch v. DOS*,
  241 F. Supp. 3d 174 (D.D.C. 2017) ..............................................................14

*Judicial Watch, Inc. v. United States Postal Serv.*,
  297 F. Supp. 2d 252 (D.D.C. 2004) ..............................................................19

*N.Y. Times Co. v. United States DOD*,
  499 F. Supp. 2d 501 (S.D.N.Y. 2007)...........................................................24

*Nat'l Day Laborer Org. Network v. ICE*,
  811 F. Supp. 2d 713 (S.D.N.Y. 2011) ("*NDLON*")...................................12

*Nat'l Council of La Raza v. United States DOJ*,
  411 F.3d 350 (2d Cir. 2005)..........................................................................9

*Nat'l Imm. Project of the Nat'l Lawyers Guild v. DHS*,
  868 F. Supp. 2d 284 (S.D.N.Y. 2012) ("*NIP*")..........................................9

*Nat'l Resources Defense Council v. U.S. Dep't of Defense*,
  388 F. Supp. 2d 1086 (C.D. Cal. 2005) .........................................................13

*Nat'l Resources Defense Council, Inc. v. Nat'l Marine Fisheries Serv.*,

    409 F. Supp. 2d 379 (S.D.N.Y. 2006)................................................................13

*New York Times Co. v. U.S. Dep't of Def.*,

    499 F. Supp. 2d 501 (S.D.N.Y. 2007)................................................................19

*NLRB v. Sears, Roebuck & Co.*,

    421 U.S. 132 (1975) ("*Sears*")....................................................... 10, 13, 18, 22

*Pacific Molasses Co. v. NLRB*,

    577 F.2d 1172 (5th Cir. 1978) ..........................................................................21

*Petroleum Info. Corp. v DOI*,

    976 F.2d 1429 (1992).........................................................................................10

*Playboy Enterprises, Inc. v DOJ*,

    677 F.2d 931 (D.C. Cir. 1982) ..........................................................................14

*Pub. Citizen, Inc. v. OMB*,

    598 F.3d 865 (D.C. Cir. 2009) ............................................................................9

*Reino de España v. Am. Bureau of Shipping*,

    2005 WL 1813017 (S.D.N.Y. Aug. 1, 2005)....................................................10

*Sterling Drug, Inc. v. FTC*,

    450 F.2d 698 (D.C. Cir. 1971) ..........................................................................22

*Tax Analysts v. IRS*,

    117 F.3d 607 (1997)...........................................................................................14

*United States v. Adlman,*

    134 F.3d 1194 (2d Cir. 1998).............................................................................24

*Wilderness Soc'y v. United States DOI*,

    344 F. Supp. 2d 1 (D.D.C. 2004) ......................................................................21

## STATUTES AND RULES

5 U.S.C. § 552(a)(1)(D) ............................................................................................1

8 U.S.C. § 1254(3)(C)...............................................................................................11

8 U.S.C. § 1254(a)(i)................................................................................................17

8 U.S.C. § 1254(b)(1) ..............................................................................................11

8 U.S.C. § 1254(b)(3) ......................................................................................*passim*

8 U.S.C. § 1254(b)(3)(A) ................................................................4

8 U.S.C. § 1254(b)(3)(B) ...............................................4, 11, 17, 23

8 U.S.C. §1254a(a)(2) ...................................................................5

## OTHER AUTHORITIES

134 Cong. Rec. 28495 (Oct. 5, 1988)

    (statements of Rep. Fish and Rep. Swindall) .................................3

135 Cong. Rec. HR 3843 (Mar. 9, 1989) (statement of Rep. Mazzoli) ....................3

136 Cong. Rec. S 17112 (Oct. 26, 1990) ...................................................3

Alan Gomez, "Trump administration overruled U.S. embassy officials

    to end immigration program" USA Today, (May 8, 2018) ............................. 13

Jacqueline Charles, "DHS Chief Tells Haiti's President: Start Thinking

    About Bringing Haitians on TPS Home" Miami Herald (July 1, 2017)...........................5

Letter from Sen. Markey, et al. to DHS Sec'y Nielsen and

    USCIS Dir. Cissna (May 8, 2018) ......................................................8

Linda J. Oswald, *Extended Voluntary Departure: Limiting the*

    *Attorney General's Discretion in Immigration*,

    85 MICH. L. R. 152, 158 n.40 (1986) ..................................................2

Nick Miroff "Tens of thousands of Haitian, Central American

    immigrants could lose protected status" (Oct. 20, 2017) ..................................5

Rafael Bernal, "Trump close to wiping out TPS program

    for immigrants" The Hill (May 11, 2018) ...........................................1

*Stay of Deportation for Undocumented Salvadorans and Nicaraguans:*

    *Hearing on H.R. 618 Before the Subcomm. On Imm., Refugees*

    *and Int'l L. of the H. Comm. on the Judiciary*, 100th Cong. 135 (1987)...........................3

*Temporary Safe Haven Act of 1987: Hearing Before the Subcomm.*

    *on  Immigration, Refugees, and International Law of the H. Comm.*

    *on the Judiciary*, 100th Cong. 2 (1987) (statement of Rep. Mazzoli) ...............................3

# PRELIMINARY STATEMENT

The purpose of the Freedom of Information Act ("FOIA") is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976). Under FOIA, agencies must disclose new standards and policies. *See* 5 U.S.C. § 552(a)(1)(D). It is antithetical to FOIA for an agency to hide a changed standard and apply it retroactively to people who have relied on the *old* standard. It is even worse that the agency refuse to reveal the new standard in answer to a FOIA request.

Defendants, the United States Department of Homeland Security ("DHS") and Department of State ("State"), invoke FOIA's deliberative process, attorney-client, and privacy privileges to withhold large parts of two document productions made to Plaintiffs. These privileges do not apply to documents that, as here, (1) reveal the agencies' decision to dismantle Temporary Protected Status ("TPS"), a statutory program that offers country-specific "safe havens;" (2) represent the application of an undisclosed standard to Haiti; (3) are the component parts of a decision that the statute pins on a factual, not policy, determination; or (4) indicate factual inquiries whose purpose was to justify the decision to dismantle TPS.

The termination of TPS for Haiti on November 20, 2017 is part of an unprecedented series of consecutive terminations punctuated only by the extension of TPS for Syria. In just fifteen months, DHS has terminated six TPS designations[1]. Prior to this period, over the entirety of TPS' 28-year existence, only twelve  countries had their designations terminated.[2] This sudden change could not plausibly comport with the statute, which requires that the decision to

---

[1] Rafael Bernal, "Trump close to wiping out TPS program for immigrants" The Hill (may 11, 2018) http://thehill.com/latino/387365-trump-close-to-extinguishing-tps-program-for-immigrants
[2] United States Department of Justice, Executive Office for Immigration Review "Temporary Protected Status" https://www.justice.gov/eoir/temporary-protected-status.

extend or terminate a TPS designation follow directly from a "review [of] the conditions" underlying the designation and an inquiry into whether they persist. 8 U.S.C. § 1254(b)(3). In the case of Haiti, the initial designation was based on a devastating 2010 earthquake. TPS for Haiti was redesignated in 2011 because of a severe cholera epidemic and was extended four times. 56.1 Stmt. of Uncontested Material Facts ¶16. Acting Secretary of Homeland Security Elaine Duke terminated TPS for Haiti in November 2017, even though any objective review would show that the conditions for Haiti's designation continued to exist. 56.1 ¶1. Indeed, the agency's own civil servants came to that conclusion in October 2017, only to be disregarded by superiors. 56.1 ¶ 61; *see also* 56.1 ¶ 64. As Plaintiffs' memorandum will show, Defendants have improperly withheld records that reveal their decision to apply a new standard to TPS or reflect their attempt to fit a predetermined political outcome into the mandated fact-based procedure.

**BACKGROUND**

**A.  Congress Passed TPS in Order to Provide Clear Criteria for Designating, Extending, and Terminating Country-Specific "Safe Havens," Replacing a Previous Program That Lacked Any Meaningful Standard.**

Congress created TPS in 1990 to remedy the lack of standards associated with Extended Voluntary Departure ("EVD"), a practice through which the Attorney General discretionarily waived enforcement of removal orders against classes of noncitizens. Between 1960 and the mid-1980s, attorneys general granted and extended EVD for seventeen countries, for periods of one to twelve years. *See* Linda J. Oswald, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration*, 85 MICH. L. R. 152, 158 n.40 (1986).

Both Congress and executive officials understood that EVD lacked a formal structure for designation, extension, or termination. In 1983, for example, Attorney General William French Smith wrote Secretary of State George Schultz that ere no modular criteria for EVD decisions,

2

which were made on a "situation by situation" basis. Letter from Att'y Gen. William French Smith to Sec'y of State George Schultz (Jul. 19, 1983).[3] Rep.  Romano Mazzoli, one of TPS' framers, stated in 1987 that "EVD decisions [were] made on an ad hoc basis without proper guidelines or standards." *Temporary Safe Haven Act of 1987: Hearing Before the Subcomm. on Immigration, Refugees, and International Law of the H. Comm. on the Judiciary*, 100th Cong. 2 (1987) (statement of Rep. Mazzoli).

In the late 1980s, Congress began envisioning a new program with strict parameters, instead of ad hoc action, to provide a safe haven to citizens of certain countries. Congress first provided permanent status to some EVD beneficiaries and then developed a new framework to replace EVD. To replace EVD, Congress sought an "evenhanded" approach that "parallel[ed] numerous other examples [asylum, visa preferences] where a [*sic*] statutory framework establishes the criteria under which the executive department exercises its discretion to admit foreign nationals." 134 Cong. Rec. 28495 (Oct. 5, 1988) (statement of Rep. Fish). In addition to setting down criteria, the new program would also "describe the rights and responsibilities" of beneficiaries. *Id.* (statement of Rep. Swindall). TPS replaced a program "without sound, statutory basis" that was "granted and withdrawn arbitrarily." 135 Cong. Rec. HR 3843 (Mar. 9, 1989) (statement of Rep. Mazzoli).

In addition to creating a standard, TPS mandates periodic review such that the status is available so long as it is necessary. *See*, *e.g.*, 136 Cong. Rec. S 17112 (Oct. 26, 1990) ("As long as the violence continues…, we should open our arms to Lebanese already in this country who fear for their lives if they should return.") Similarly, the law provides for a wholly non-

---

[3] The letter is included in the record of the testimony of Deputy Assistant Secretary of State for Regional Affairs Richard Holwill before the House Judiciary Committee. *See Stay of Deportation for Undocumented Salvadorans and Nicaraguans: Hearing on H.R. 618 Before the Subcomm. On Imm., Refugees and Int'l L. of the H. Comm. on the Judiciary*, 100th Cong. 135 (1987) (letter from Att'y Gen. William French Smith to Sec'y George Schultz).

discretionary procedure for extending or terminating a designation, stating that "the Attorney General, after consultation with appropriate agencies of the Government, *shall* review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect…and *shall* determine whether the conditions for such designation…continue to be met." (emphasis added). 8 U.S.C. § 1254(b)(3)(A). Unless the Secretary finds that the conditions do not continue to be met, the statute requires the status continue. 8 U.S.C. § 1254(b)(3)(B)-(C).[4]

This period review is the temporary feature in TPS, something that distinguishes it from statutory alternatives like permanent residency. Rather than setting a cap on the number of times the DHS Secretary may extend a TPS designation, the statute requires the Secretary to extend based on his or her evaluation of fact. So long as the periodic review indicates that conditions continue to require an extension, the Secretary must extend. Congress did not restrict the number of times TPS can be extended. Since it is the necessary product of a factual determination, the decision for one option or the other involves no policy formulation and is therefore not deliberative. *See Ctr. for Biological Diversity v. EPA*, 279 F. Supp. 3d 121 (D.D.C. 2017) (documents related to "binary determination" based on empirical data were not subject to privilege). When conducted in accordance with the statute, the decision to terminate a country's TPS status would therefore not be subject to the DPP.

Because of the mandatory nature of extensions if the underlying facts do not support termination, TPS provides a stable set of expectations.  While the conditions in the country of origin persist, beneficiaries only face termination of their status under two scenarios: (1) if the

---

[4] Individual deportations to the country or visa traveling were never part of the consideration for providing safe haven for large groups of immigrants who qualified under TPS criteria. For example, soon after Haiti was deisgnated for TPS in 2010, ICE announced in April 2011 that it would begin deporting people with criminal records but that this would not affect TPS holders/eligible applicants, evidencing that the mere fact of removals is not relevant to whether TPS should be continued. *See* USCIS "Policy for resumed removals to Haiti" (April 1, 2011) https://www.ice.gov/news/releases/policy-resumed-removals-haiti.

conditions in their country of origin ceased to exist so that it is actually safe for the full group to return; or (2) if an individual TPS recipient no longer met the individual criteria for the program due, for example, to a criminal conviction. Those with continued eligibility are provided with work authorization, 8 U.S.C. §1254a(a)(2), and make decisions based on their ongoing eligibility to live and work with documentation, including decisions about mortgages, business investments, schooling, career choices, and remaining in the United States rather than seeking a different safe haven. A change in the standard for extension disrupts these settled expectations.

For months, DHS officials have alluded publicly to a new interpretation of the statute, but have never provided any official notice of a changed standard for TPS. For example, in May 2017 then-DHS Secretary Kelly stated: "[T]he message is: by definition, TPS is temporary . . . [Haitian TPS holders] should start thinking now about what will happen in the not-too-distant future . . . " 56.1 ¶ 53. In July 2017, Kelly hinted that TPS for Haiti would be terminated and added that Congress should step in to fix the issue because "[t]his is squarely on them."[5] In October 2017, DHS spokesperson David Lapan, echoing Kelly, said: "We are looking at the fact that temporary protected status means temporary, and it has not been temporary for many years."[6] Finally, on April 4, 2018, DHS Secretary Kirstjen Nielsen could boast that the agency had successfully "ended so-called 'temporary immigration programs' that were either constitutionally dubious or were administered in a manner that was inconsistent with the purpose of the law or contrary to the intent of Congress." 56.1 ¶ 63

**B.  In 2017, USCIS Terminated TPS for 98% of Beneficiaries, Including 58,000 Haitians, After Publicly Indicating Its Plan To Set a Time Limit On TPS Designations**

---

[5] Jacqueline Charles, "DHS Chief Tells Haiti's President: Start Thinking About Bringing Haitians on TPS Home" Miami Herald (July 1, 2017) http://www.miamiherald.com/news/nation world/world/americas/haiti/article153907329.html
[6] Nick Miroff "Tens of thousands of Haitian, Central American immigrants could lose protected status" (Oct. 20, 2017)

The information obtained through the heavily-redacted documents produced through this FOIA litigation support the theory that, behind closed doors, the agencies were working to implement a plan to dismantle TPS that was never properly disclosed to the public. In early 2017, newly appointed agency staff moved quickly to halt existing plans for TPS and instituted a new approach to the program without any official notice to the public. Although USCIS had recently reviewed country conditions for Haiti and agency staff had prepared a notice to extend for 18 months, the extension was pulled in March 2017 and shortly after his appointment in early April agency staff provided then-Acting Director of CIS, James McCaments, with a replacement memo laying out options rather than announcing extension. 56.1 ¶¶ 26-33 The Acting Director disregarded in large part CIS' own report on the conditions in Haiti, and instead cherry-picked facts to support his recommendation to terminate TPS for Haiti. 56.1 ¶ 36. Just days after starting her position on April 2, 2017, the Chief of the Office of Policy & Strategy at CIS, Kathy Nuebel Kovarik, tasked agency staff with searching for information on TPS recipients, including criminal convictions and use of public benefits. Ms. Kovarik told staff to adduce information "[g]iven that the Sec is going to need it to make a decision . . ." 56.1 ¶ 43

Likewise, State was asked to prepare a new recommendation although former Secretary of State John Kerry had overseen an evaluation of the conditions in Haiti in December 2017, which found that TPS should be extfended. 56.1 ¶¶ 26-30. The justification for this new evaluation was a need for input of officials appointed by the new administration. In March, State asked CIS to help put "State's current position on Haiti's TPS designation on an expedited track." 56.1 ¶ 29

In a matter of weeks, the agencies reevaluated the same conditions considered when they found an extension of TPS for Haiti was warranted. To supplement the reevaluation, the agencies

inquired into inappropriate facts that are not germane to the statutory standard, which focuses on conditions in the country under review, not data on the lives and habits of TPS beneficiaries. The reevaluation of facts and supplemental inquiries support the theory that the purpose was to apply a new standard that would justify dismantling of the program without disclosing it to the public. Additionally, DOS abandoned its protocol limiting action memos for TPS decisions to two pages, because of its unprecedented inclusion of four different TPS-designated countries with different expiration dates in one memo. 56.1 ¶¶ 56-58

DHS Secretary John Kelly's announcement that Haiti's TPS designation would be extended for six months in May 2017 exemplifies the agency's new view of TPS. When extending, Kelly indicated that Haitian TPS holders should prepare for termination and stated that the extension was intended to give a settling period to the new Haitian government. 56.1 ¶ 24 An extension for political reasons, with an attendant warning that termination was imminent, represents a clear departure from the TPS statute as it had been applied to previous determinations, which were based on consideration of country conditions.

Meanwhile, Francis Cissna, the new Director of USCIS, issued a recommendation to terminate that distorted facts developed in the staff analysis. 56.1 ¶ 61 The State Department, in turn, prepared the requested new evaluation supporting termination, looking at four countries at once and preparing letters in a batch process. 56.1 ¶¶ 56-60 Shortly thereafter, as Kelly had hinted in May, Acting Secretary Duke issued her unorthodox press announcement to terminate TPS for Haiti in November 2017.  56.1 ¶¶ 1-3 It was not until January in the Federal Register that the agency even referenced the cholera epidemic that was the basis for the redesignation of TPS for Haiti in 2011. 56.1 ¶ 5. Although agency officials alluded to applying a new standard, it was not disclosed to the public through Federal Register notice, as the statute requires. Instead,

the agencies changed the standard, published notices in the Federal Register that were written as though they had followed statutorily mandated procedures including consideration of relevant facts, and then claimed deliberative process protections on internal documents which would disclose their new standard.

## C.  Both the March 22 and the March 29 productions by DHS and DOS raise what a group of twelve U.S. Senators have called "serious questions about the integrity of [DHS'] justification for terminating [TPS] for Haiti."

The documents at issue in this motion are from (1) USCIS in the lead-up to the temporary extension of TPS to Haiti; (2) DHS and State for the final decision packets in the Fall 2017, and (3) DHS for the Federal Register notice of termination in January 2018. Even in a highly redacted form, these documents raise what a group of twelve United States Senators have called "serious question about the integrity of [DHS'] justification for terminating [TPS] for Haiti." Letter from Sen. Markey, et al. to DHS Sec'y Nielsen and USCIS Dir. Cissna (May 8, 2018), p. 2. The lawmakers state that the discrepancies between the USCIS report on Haiti and the memorandum Director Cissna created for then-Acting Secretary Duke[7] demonstrate at best a "mistaken reading of the report," or, at worst, that the "Administration is intentionally distorting the TPS-renewal assessment for political purposes." *Id*.

In addition to Congressional interest in the termination of TPS for Haiti and other countries, several news outlets have reported on the documents obtained through this FOIA litigation. 56.1 ¶¶ 64 The termination is still sparking public debate, with the latest article published on May 17 discussing documents obtained through the CIS May 7 production. *Id.*

### ARGUMENT

## I.  The Government Bears a Heavy Burden When Withholding Documents Related to the Termination of TPS

---

[7]The Congressional letter cites to this FOIA litigation and relies on documents obtained through the court-ordered document productions.

**A. The Deliberative Process Privilege Does Not Protect Hidden Agency Interpretations and Efforts to Obscure and/or Justify an Already-Made Decision**

To assert the deliberative process privilege (DPP), it is the government's burden to prove that a document is both "predecisional and deliberative." *Nat'l Imm. Project of the Nat'l Lawyers Guild v. DHS*, 868 F. Supp. 2d 284, 290 (S.D.N.Y. 2012) ("NIP") (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999)). The inquiry turns on two things: (1) whether the document is "'predecisional,' i.e., 'prepared in order to assist an agency decisionmaker in arriving at his decision,' and (2) 'deliberative,' i.e., 'actually . . . related to the process by which policies are formulated.'" *Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. United States DOJ*, 697 F.3d 184, 194 (2d Cir. 2012) (quoting *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2005)); *See also ACLU v. DOD*, 2017 WL 4326524, at *15-16 (S.D.N.Y. Sept. 27, 2017) (to qualify for DPP documents must be made to assist a decisionmaker in arriving at a decision, and also be part of agency "give and take" of the deliberative process); *Elec. Frontier Found. v. United States DOJ,* 739 F.3d 1, 7 (2014) (quoting *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 875 (D.C. Cir. 2009) (DPP-privileged materials must 'reflect[] advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated, [or] the personal opinions of the writer prior to the agency's adoption of a policy.") In the case at hand, the requirements for DPP have not been met. The salient decisions with respect to TPS had already been made, which is apparent from the immediate steps agency officials took to halt the normal operations of the agency with respect to TPS (including the prepared extension for Haiti in March 2017, and the publication of a report to Congress on TPS). At this point, agency officials were already implementing a decision to dismantle TPS, making the materials in question here neither pre-decisional nor

deliberative. To accomplish its goal, the agency appears to have re-interpreted the meaning of the

TPS statute, as is evidenced by events including a May 2017 extension that was accompanied by

a warning that the agency was planning to terminate TPS, as well as indications that the

extension was done for political reasons outside the statute's parameters. To the extent that the

agencies engaged in some semblance of the previously followed procedure (examining facts

regarding country conditions) they appear to have looked for and selected factual material that

they could characterize as supportive of the decision to terminate announced in November 2017,

rather than examining the facts and using them to *reach* a decision on TPS for Haiti. For these

reasons, the documents in question here are post-decisional, non-deliberative, and cannot meet

the criteria for DPP. *See, e.g., Hall & Assocs. v. EPA*, 846 F. Supp. 2d 231, 244 (D.D.C. 2012)

"In contrast to predecisional documents, postdecisional documents are not covered by the

deliberative process privilege. Examples of postdecisional documents can be seen when the

records at issue reveal 'statements of policy and interpretations which have been adopted by the

agency' or 'instructions to staff that affect a member of the public.'" (quoting *NLRB v. Sears,

Roebuck & Co.*, 421 U.S. 132, 153-54 (1975) ("*Sears*").

   Moreover, had the agencies conformed to the TPS statutel, and to the extent that the did

so at all, that process would beyond the reach of DPP. Decisions to extend or terminate TPS

designations are not the kinds of policy judgments that the privilege protects. *See, e.g.*,

*Petroleum Info. Corp. v DOI*, 976 F.2d 1429*,* 1435 (1992) (privileged materials "must bear on

the formulation or exercise of agency policy-oriented *judgment*.") (emphasis in original); *Reino

de España v. Am. Bureau of Shipping*, 2005 WL 1813017 (S.D.N.Y. Aug. 1, 2005) (privilege

does not apply to documents related to policy formulations). While the statute gives the DHS

Secretary discretion to *designate* a country, his or her decision to *extend* or *terminate* follows

mandatorily from the results of the factual reviews conducted at the end of each designation. *Compare* 8 U.S.C. § 1254(b)(1) ("The Attorney General…*may* designate…") *with* 8 U.S.C. § 1254(b)(3)(B) ("If the Attorney General determines [pursuant to factual review] that a foreign state…no longer continues to meet the conditions for designation, the Attorney General *shall* terminate the designation…") *and* 8 U.S.C. § 1254(3)(C) ("If the Attorney General does not determine [pursuant to factual review] that a foreign state…no longer meets the conditions for designation…, the period of designation of the foreign state *is* extended.") (emphasis added); *see also Berkovitz by Berkovitz v. US*, 486 U.S. 531, 536 (1988) ("[C]onduct cannot be discretionary unless it involves an element of judgment or choice."). Extension, if done in accordance with the statute, cannot properly be described as a "decision" because the statute dictates what must be done if the facts support extension. [8]

In the case at hand, there are many indications that the decision to terminate TPS for Haiti was not compliant with the statute's mandate nor the way agency officials had implemented the statute for decades, and reflected a pre-existing shift with respect to the agencies' approach to TPS. Although DHS published Federal Register notices for Haiti in May 2017 and January 2018 that made no mention of a changed standard, the manner in which these determinations were made belies the notion that they were done in compliance with the statute. The documents plaintiffs have received thus far reveal that the agencies sought information irrelevant to a TPS determination (e.g. criminal histories of people from Haiti). Further, although they did not follow through with the proposal to terminate in May, the documents and public statements reveal that they treated a short extension as a political expediency and issued the

---

[8] It is notable that the government, in its brief, uses language similar to one of the partially redacted memos from State regarding TPS for four countries including Haiti, mischaracterizing the Secretary's decision to extend if country conditions remain as optional, rather than mandatory.

extension as a build up to the termination announcement in November. DHS then ultimately published a Federal Register notice of termination that purported to be based in country conditions but was in fact a product of months of work to make the new approach to TPS appear palatable to the public. This lack of transparency on the part of the agencies cannot support an argument that DPP should apply here because "[t]he concern of the privilege is to prevent the chilling of internal agency discussions that are necessary to the operation of good government; it is not concerned with chilling agency efforts to obfuscate, which are anathema to the operation of democratic government...'[t]he point is not to protect Government secrecy pure and simple.'" *Nat'l Day Laborer Org. Network v. ICE*, 811 F. Supp. 2d 713, 741-42 (S.D.N.Y. 2011) ("NDLON") (quoting *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001)).

In addition to the fact that the documents post-date an undisclosed decision to change the standard for TPS are therefore outside of DPP, documents in the March 22 and March 29 productions also fall under the "working law" exception to DPP.  The working law exception is a widely-recognized doctrine (including in this circuit) that forbids the use of DPP to exempt from disclosure materials that involve a policy that is already in use internally but has not been officially disclosed to the public. *See, e.g.*, *Brennan Ctr.*, 697 F.3d at 196 (noting that, unlike documents representing policy formation, "[t]he reasons for a decision made by an agency, or a policy actually adopted...'constitute the 'working law' of the agency" Therefore, all "opinions and interpretations which embody the agency's effective law and policy" must be disclosed due to FOIA's reflection of a "strong congressional aversion to secret agency law" and "affirmative congressional purpose to require disclosure of documents which have the force and effect of law."). Documents that reflect the already-decided "working" or "secret" law of the agency, rather than the creation of policy, cannot be withheld under DPP because an agency's stance

"'that it may adopt a legal position while shielding from public view the analysis that yielded that position is offensive to FOIA.'" *La Raza*, 411 F.3d at 360. DHS cannot withhold documents as "pre-decisional" when they have "failed to acknowledge a shift in policy when it is patently obvious — from public documents and statements — that there has been one." *NDLON*, 811 F. Supp. 2d at 742-43. Here, the documents that defendants claim are exempted under DPP cannot fall under its protections because they reflect efforts to implement and justify a decision to dismantle TPS that had already been made. This is evidenced by the aforementioned statements by agency officials, the productions plaintiffs have already received including the documents at issue here, and the fact that DHS has now terminated TPS for 98% of its beneficiaries.[9] The Supreme Court has explained that where, as here, materials reflect "opinions and interpretations which embody the agency's effective law and policy …an agency must disclose [it]." *Sears*, 421 U.S. at 153.

## B. Reasonably Segregable Factual Material is Not Protected by the Deliberative Process Privilege

The agencies must disclose "purely factual material" that is segregable from the portions of the documents that they wish to withhold. *See, e.g.*, *EPA v. Mink*, 410 U.S. 73, 91 (1973) (agencies must release "severable" factual material). In the TPS context, many documents narrate inquiries into country conditions, which are factual or nature, or incorporate parts of those inquiries into broader communications. *See Nat'l Resources Defense Council v. U.S. Dep't of Defense*, 388 F. Supp. 2d 1086, 1106 (C.D. Cal. 2005); *Nat'l Resources Defense Council, Inc. v. Nat'l Marine Fisheries Serv.*, 409 F. Supp. 2d 379, 385 (S.D.N.Y. 2006) ("Subjective opinions with respect to an agency's policy are protected….But preliminary findings as to objective facts

---

[9] Alan Gomez, *Trump administration overruled U.S. embassy officials to end immigration program* USA Today, (May 8, 2018) ("All told, the administration has announced the end of TPS for six countries, which represent 98% of the 317,000 people who have used the program to legally live and work in the U.S. for decades.")

are not shielded….”); *Grand Cent.*, 166 F.3d at 482 “[T]he privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment.” These country conditions are no more protected simply because civil servants found certain of them responsive to their task to evaluate TPS designations. *See, e.g.*, *Playboy Enterprises, Inc. v DOJ*, 677 F.2d 931, 935 (D.C. Cir. 1982). (“[A] report does not become a part of the deliberative process because it contains only those facts which the person making the report thinks material.”); *Judicial Watch v. DOS*, 241 F. Supp. 3d 174, 185 (D.D.C. 2017) (“[T]he mere selection of facts to be incorporated in a summary is [not] enough in and of itself to satisfy the requirement that it be deliberative.”). Since they have not shown how any factual material is “inextricably intertwined” with privileged material, the agencies have not met their “burden of establishing the necessity of keeping its records’ factual observations undisclosed.” *Hopkins v. U.S. Dep’t of Housing & Urb. Dev.*, 929 F.2d 81, 85 (2d Cir. 1991).

## II. The Government Has Not Met Its Burden With Respect to the Documents It Seeks to Withhold.

### A. The Emails and Documents Produced by DHS on March 29, 2018 Do Not Warrant Redaction Because They Are Post-Decisional  and May Also Contain Agency “Working Law” and/or Factual Material

#### i. Emails Regarding “Discussions” about the Termination of TPS for Haiti Are Not Subject to the Deliberative Process Privilege

The April 2017 emails, which DHS claims are as predecisional interagency dialogue, are not protected because they  form part of the agencies’ post hoc attempts to create a veneer of compliance with the law by finding and characterizing facts that appeared to support termination.[10] Therefore, the April 7, 2017 email from a redacted sender to Francis Cissna and

---

[10] *See NIP.*, 868 F. Supp. at 294-95 (quoting *Tax Analysts v. IRS*, 117 F.3d 607, 618 (1997)). (“While the deliberative-process privilege protects agencies from the type of scrutiny that might interfere with policy

two redacted individuals is not privileged because (as unredacted emails from individuals such as

Kathy Nuebel Kovarik have shown) the search for information was not in the interest of making

a decision, but rather providing support for one that had already been made. Dkt. No. 58-2 at 12.

Additionally, it is entirely possible that this email contains factual material given that it involves

a request for "information." 56.1 Exh. D at 93 Furthermore, the April 19, 2017 email from a

redacted sender to two groups (Policy Executive Secretary and Immigration Policy) came weeks

after the decision to reverse course on the 18-month extension that was ready for approval and to

begin searching for facts that instead would justify termination. Finally, the April 20, 2017 email

for which both the sender and recipient are redacted similarly postdates the decision to change

the standard for TPS. *See id*. at 7. DHS' vague description provides no indication that this email,

too, should not therefore be disclosed.[11] *See id*. In fact, the partially unredacted section of the

email indicates that it refers to a March 22, 2017 email produced unredacted to plaintiffs

regarding a meeting with DHS staff on creating an new DOS recommendation updated in light of

the change in administration. This is a strong indication that the redacted text would relate to

agency efforts to implement their publicly-undisclosed plan regarding TPS.

> **ii. The April 2017 Draft Regulatory Action Has Been Improperly Withheld by DHS Because It Does Not Involve a Policy Decision And Likely Contains Factual Material**

The deliberative process privilege does not apply to the draft regulatory action

recommending a TPS extension and two related emails sent within DHS and to the on April 18,

---

formulation, overly broad protection from all scrutiny would frustrate the very purposes of FOIA. 'Whenever an agency's actions are opened to public view, the agency exposes itself to pressure and criticism.'") The Court explained that arguments about the adverse effect of disclosure on "the process of interpretation and exposition which constitutes an 'agency's effective law and policy,'" are unpersuasive as this privilege protects policy formulation, not implementation. *Id.*

[11] *See NIP v. DHS*, 868 F. Supp. 2d at 294-95 (rejecting an assertion of the DPP when the agency lacked "some account...of how disclosure will adversely affect the formulation of policy, rather than the process of interpretation and exposition which constitutes an 'agency's effective law and policy,' ")

2017. *See* Dkt. No. 58-2 at 9-10. When compared to the intra-agency discussions from the preceding month, the two emails demonstrate that none of the material is deliberative or predecisional. *See generally* 56.1 ¶¶26-30. The first email, sent at 9:54am, lists instructions for commenting on the attached action, which it describes as a notice that DHS is "*extending* the designation of Haiti for [TPS] for 18 months…." 56.1 Exh. D at 88. The second email, sent at 2:00pm, states "See revised summary" and then describes the attachment as an notice that DHS is "terminating the TPS designation of Haiti." *Id.* DHS has already disclosed the discussion that occurred in the time between these emails (i.e., a rapid switch from an extension notice to termination). 56.1 ¶¶26-30. This back-and-forth indicates that the regulatory action likely shows that agency officials were implementing their plan to dismantle TPS.

It is not enough to make it deliberative that the email exchange precedes the public adoption of the decision to extend in May with a warning that termination was imminent and to ultimately announce termination in November. Rather, DHS must show that the draft attached to the email was "actually…related to the process by which [the termination decision was] formulated." *Jordan v. DOJ*, 591 F.2d 753, 758 (D.C. Cir. 1978). Given that DHS had already decided it would terminate TPS for Haiti, whatever changes exist between the draft and the final notice do not constitute deliberation. This is especially true since the draft does not contain the individual comments it solicits. *See e.g.*, *Conservation Force v. Jewell*, 66 F. Supp. 3d 46, 60 (D.D.C. 2014) (agencies positions that are "as yet only…personal" are exempt). To the extent the draft reveals the new standard applied to TPS reviews, that information must be disclosed as the agency's internal working law.

Defendant's *Vaughn* index makes no mention of factual material, but any Federal Register notice of termination for TPS must, under the statute, include the "basis for termination"

which would include factual material.[12] The agency has therefore failed to meet its burden of establishing that no reasonably segregable factual material can be disclosed, and it must disclose any such material. *Hopkins*, 929 F.2d at 85 (requiring that an agency establish why factual material cannot be disclosed).

### iii. The Deliberative Process Privilege Cannot Apply to the Calendar Year 2016 Report on TPS Because It Does Not Involve a Decision-Making Process and, to the Extent That it Lays Out an Overall Approach to TPS and/or Discusses Facts, That Material Must Also Be Disclosed

USCIS' draft report on TPS for the year 2016 should not include any deliberative or decision-making process. *See* Dkt. No. 58-2 at 5. DHS is obligated to provide this report each year pursuant to 8 U.S.C. § 1254(a)(i), and the table of contents and unredacted portions show that it describes the legal structure of TPS and narrates the basis of TPS decisions. *See* 56.1 Exh. D at 36. A draft in which this kind of factual material is revised is not protected by the deliberative process privilege. *Cf. Allocco Recycling, Ltd. v. Doherty*, 220 F.R.D. 407, 414 (S.D.N.Y. 2004) ("To the extent that any portion of the report expresses an 'opinion,' it is simply an opinion regarding what occurred in the past rather than advisory opinion regarding future agency action."); *Fox News Network, LLC v. US Dep't of Treasury*, 911 F. Supp. 2d 261, 283 (S.D.N.Y. 2012) ("email thread…discussing proposed messages and themes" was not protected because it was "predominately backward-looking and explain[ed] decisions that the agency previously made.").

Even if the drafts do reveal DHS' undisclosed new standard, that does not make the draft report deliberative because it was not "generated as part of a *definable* decision-making process." *100Reporters LLC v. DOJ*, 823 F.2d 574, 585 (D.D.C. 2017); *see also Heartland Alliance v. DHS*, 291 F. Supp. 3d 69, 79 (D.D.C. 2018) (draft statistical reports were not privileged because

---

[12] 8 U.S.C. § 1254(b)(3)(B)

DHS identified no specific policy decision to which the reports contributed). If it is the case that this report announced an undisclosed policy, that would lack privilege as agency "working law." *See Brennan Ctr.*, 697 F.3d 184, 194-95 (2d Cir. 2012) (quoting *Sears*, 421 U.S. at 153) ("[A]n 'opinion[] [or] interpretation which embod[ies] the agency's effective law and policy,' in other words, its "working law," cannot be withheld).

### iv. Documents Such As a Drafted Letter to a Congressperson, a Response to an Inquiry from the Haitian Ambassador, and Public Affairs Guidance from DOS, Prepared in Order to Explain an Existing Decision to the Public, Are Not Protected by The Deliberative Process Privilege

Agency discussions of how to respond to questions about a previously determined policy do not relate to the formation of the policy, but only its characterization in communications with the public. Such guidance for media relations without any deliberation about actual policy is not exempt under the DPP. Where, as appears here, "agency personnel are debating, both implicitly and explicitly, how frank to be with the public about what the agencies' policies are," the materials are not privileged. *NDLON*, 811 F. Supp. 2d at 741-42. It follows, therefore, that the draft correspondence to a member of Congress "regarding Departmental actions regarding Haiti's TPS designation" cannot be privileged, Dkt. No. 58-2 at 1, nor can the redacted "recommendation for how to respond to a letter from the Haitian Ambassador requesting a meeting between the Secretary of Homeland Security and the Haitian Foreign Minister," which also "discusses the anticipated responses of DHS components regarding the Ambassador's request." If the letter to a congressperson is a draft, "a draft is only privileged if it contains discussions that reflect the policy-making process. It is not privileged if it reflects the personal opinions of a writer with respect to how to explain an *existing* agency policy or decision."

*NDLON*, 811 F. Supp. 2d at 741 (emphasis in original). [13] Although the May 2017 Federal Register notice had not yet been published, the agency's overall policy with respect to TPS was in place.

Similarly, the Draft Public Affairs Guidance sent by DOS and withheld by DHS represents not "part of a continuing process" of policy formulation, but the implementation of a plan to dismantle TPS.[14] Dkt. No. 58-2 at 4. The fact that the agency eventually announced an unorthodox six-month extension plus a warning to prepare for termination does not negate the fact that the process as a whole centered on the decision to terminate TPS for Haiti and on the broader shift in agency policy towards TPS. Therefore, these documents are outside of the scope of the DPP.

**B. The Packets Produced by DHS and DOS on March 22, 2018 Are Not Subject to Exemption 5 Because These Documents Were Not Part of a Deliberative Process, But Rather Were Created in an Attempt to Justify a Decision to Dismantle TPS that Had Already Been Reached.**

**i. The Letter from Secretary Tillerson, Action Memos, Policy Papers, and Country Specific Materials Withheld by DOS and DHS Are Post-Decisional and Likely Contain Factual Material, And Therefore Are Not Privileged.**

The letter from Secretary Tillerson to Acting Secretary Duke is not privileged because it is a product of agency efforts to create a post-hoc rationalization for a decision that had already been made. *See* Dkt. No. 59-1 at 4. When Secretary Tillerson sent Acting Secretary Duke a letter in October 2017 with recommendations for agency action on TPS for four countries (El Salvador, Haiti, Honduras, and Nicaragua), that did not represent a link in a process of

---

[13] *See also Fox News Network*, 911 F. Supp. 2d at 275 ("the mere fact that a document is a draft is not a sufficient reason to automatically exempt it from disclosure.") (quoting *New York Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 515 (S.D.N.Y. 2007))

[14] *Judicial Watch, Inc. v. United States Postal Serv.*, 297 F. Supp. 2d 252, 260 (D.D.C. 2004) ("The most basic requirement of the [deliberative process] privilege is that a document be *antecedent* to the adoption of an agency policy.  A post-decisional document, draft or no, by definition cannot be "predecisional.")

deliberation, but rather the culmination of Secretary Tillerson's participation in the justification

of large-scale termination of TPS for the vast majority of its beneficiaries. The letter cannot

accurately be described as crafted for "use in making a final determination," as defendants

characterize it in their *Vaughn* index, *see id.*, because it was written long after the agencies had

begun their efforts to create a narrative that would fit with termination, and it is doubly outside of

the DPP because it represents the final statement of the head of the agency on this issue and

constitutes the "working" or "secret" law of the agency. To withhold the Secretary's letter to

Acting Secretary Duke as predecisional violates the principle that "an agency will not be

permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties

and in its dealings with the public, but hidden behind a veil of privilege because it is not

designated as 'formal,' 'binding,' or 'final.'" *Coastal States Gas Corp. v. Dep't of Energy*, 617

F.2d 854, 867 (D.C. Cir. 1980).

The deliberative process privilege does not cover the action memos sent to Secretary

Tillerson and the attached policy papers and country-specific recommendations because they are

post-decisional, describe how to explain the decision to third parties, and contain segregable

factual material. *See* Dkt. No. 59-1 at 2 (revised policy paper), 3 (revised recommendations), 6

(policy paper), 7 (recommendations), 8 (action memo). These records prepared by DOS staff and

likely reflected the new standard and the new approach to country reviews. The country-specific

recommendations, to begin, consist primarily of material responding to the question "Have the

conditions under which the foreign state was designated for temporary protected status ceased to

exist?". Thus, "most of the information contained in the documents is purely factual in nature,

consisting of recitations of facts gleaned from [investigative work]." *Charles v. City of New

York*, 2011 WL 5838478 at *2 (E.D.N.Y. Nov. 18, 2011). Although the recommendation should

20

follow "mechanically" from the conditions and therefore should "contain[] no subjective conclusions," *Pacific Molasses Co. v. NLRB*, 577 F.2d 1172, 1183 (5th Cir. 1978), it is likely that the recommendations in this case disclose the new standard that USCIS had asked DOS to apply in evaluating the facts. Of course, the fact that these recommendations were prepared at the same time that USCIS officials were disregarding the factual conclusions of their own civil servants suggests the possibility that they were also trying to distort the factual analyses that they would need from DOS.  *See* 56.1 ¶ 61; *see also id*. at ¶ 64 (detailing press reports). The same is true for the action memos themselves and for the assessments of foreign policy impact. To the extent that either or both of these documents discuss how the decision reflected a new, extra-statutory standard for TPS, they contain a new agency policy that must be disclosed to the public. Moreover, to the extent that the strategy to dismantle TPS had become binding on lower-level employees, the recommendations are the kind of "opinion[s] about the applicability of existing policy to a certain state of facts" that are not predecisional. *See Coastal States*, 617 F.2d at 868.

DOS has withheld in full 14 documents and released 12 in part. These redacted materials include multiple drafts of the letter Secretary Tillerson sent to Acting Secretary Duke, the action memos provided to the Secretary, and the attendant country conditions reports. *See* Dkt. No. 59-1 at 1 (action memo), 2 (draft letter), 5 (draft letters), 8 (draft letters), 9 (country reports). In addition to the fact that their draft status does not make them inherently privileged,[15] these drafts appear to reveal not a deliberative process but rather efforts to craft a factual narrative aimed at justifying the DHS termination announcement for not only Haiti but three other countries constituting the large majority of TPS holders, all of which have now had their status terminated. Such documents simply facilitate Secretary Tillerson's participation in a new approach to TPS

---

[15] *See, e.g. Wilderness Soc'y v. United States DOI*, 344 F. Supp. 2d 1, 14 (D.D.C. 2004) "simply designating a document as a 'draft' does not automatically make it privileged under the deliberative process privilege."

that has torn the program asunder while maintaining, in a series of seemingly-neutral Federal Register notices, that the agencies are simply following the statute's required procedures. This is not policymaking at all - it is policy implementation - and it is certainly not the kind of legitimate agency deliberation that Exemption 5 is meant to protect.[16]

The deliberative process privilege similarly does not apply to the memorandum sent by USCIS Director L. Francis Cissna to Acting Secretary Duke on November 3, 2017. *See* Dkt. No. 58-1 at 1. This document recommending termination of TPS for Haiti represents the fruit of USCIS' efforts over the preceding seven months to distort the factual evaluation and change the standard applied to TPS. Since it was written just days after USCIS officials disregarded the factual conclusions of their civil servants, *see* 56.1 ¶64, it likely does not contain the deliberative weighing of options that it purports to present. Rather, as the agency's actions during the relevant period demonstrate, USCIS had already "a firm decision" and its final recommendation to Acting Secretary Duke was only the justification of a decision already made when Secretary Kelly issued his deferred termination earlier in the year. *Compare Fox News Network*, 911 F. Supp. 2d at 282 ("It is evident from the documents that, before work on the drafts had begun, no firm decision had been made as to [agency's approach]."

    **ii. January 2, 2018 DHS Decision Memo Cannot be Withheld Because it is not Pre-Decisional and, Additionally, Attorney-Client Privilege Does Not Apply When the Material in Question Does Not Constitute Legal Advice,**

---

[16] The "object [of the deliberative process privilege]t is to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government." *DOI v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 9, 121 S. Ct. 1060, 1066 (2001) (quoting *Sears, Roebuck & Co*., 421 U.S. at 151). Moreover, Exemption 5 has a "narrow scope" and operates in the context of a "strong policy of the FOIA that the public is entitled to know what its government is doing and why." *Coastal States*, 617 F.2d at 866 (quoting S.Rep.No. 813, 89th Cong., 1st Sess. 9 (1965)) (ordering the disclosure of memoranda from regional Department of Energy counsel to auditors working in DOE's field office). Therefore, "[a]gencies may not use the deliberative process exception to shield 'orders and interpretations which it actually applies in cases before it.' *Am. Civil Liberties Union Found. v. United States Dep't of Justice*, 833 F. Supp. 399, 406 (S.D.N.Y. 1993) (quoting *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 708 (D.C. Cir. 1971))

DHS has asserted in its *Vaughn* index for the March 22nd production that a January 2, 2018 decision memorandum titled "USCIS Notice: Termination of the Designation of Haiti for Temporary Protected Status" is protected by attorney-client privilege and the deliberative process privilege. Dkt. No. 58-1 at 2. In attempting to justify its withholding, the agency states that the document contains "legal advice regarding the publication in the Federal Register of the Secretary's decision to terminate" TPS for Haiti. *Id.* However, the publication of the decision to terminate, after the Acting Secretary had already announced it months prior, is not a question up for legal debate - the statute itself states that "[i]f the Attorney General determines...that a foreign state...no longer continues to meet the conditions for designation...the Attorney General shall terminate the designation by publishing notice in the Federal Register of the determination under this subparagraph (including the basis for the determination)."[17] Defendants represent that this memo contains "analysis of the issue, discussion of Component comments, discussion of whether coordination with OMB was recommended, and legal recommendations to the Deputy," Dkt. No. 58-1 at2, but by January 2nd, there was no question as to whether a termination notice for Haiti would be published in the Federal Register and therefore the notion that this memo could be privileged due to the inclusion of legal advice about whether to publish is illogical. The attorney-client privilege, including as applied to government attorneys and agencies, is meant to protect "'only legal advice, not economic, business, or policy advice,' " *ACLU*, 2017 U.S. Dist. LEXIS, at *12-13 (quoting *Fox News Network*, 911 F. Supp. 2d at 271)). If, as appears likely, the Deputy Counsel was discussing how the Federal Register notice could be presented to make termination appear more legitimate (for example, by adding in the reference to cholera that

---

[17] 8 U.S.C. § 1254(b)(3)(B)

appeared in the Federal Register but was absent from the November announcement) then this

document cannot be classified as containing legal advice.[18]

      For similar reasons, the DPP cannot apply here. That privilege is reserved for decisions

that have not yet been made.[19] Moreover, documents written by individuals who did not have

final decision-making authority cannot be exempted from disclosure when they involved policy

application rather than formulation, because "the public has an undeniable interest in knowing

what the law is." *NIP*, 868 F. Supp. 2d at 293-94.

## III. Defendants' Use of Exemption 6 is Overbroad and Fails to Serve the Exemption's Purpose

      DHS made widespread use of the b(6) exemption in the documents produced on March

29, 2018. When asked how DHS determined which employees' names should be redacted, the

government replied that " DHS adopted a conservative approach to distinguishing between

employees of 'relatively low rank' and 'decision-makers.'"[20] This assertion raises concerns about

the misapplication of this exemption.  The government's claim that it redacted the names of "line

level officials" offers little guidance as to how "line level" employees were separated from

others, and does not appear to have been done in a methodical or logical manner.[21]

---

[18] *See, e.g. N.Y. Times Co. v. United States DOD*, 499 F. Supp. 2d 501, 517 (S.D.N.Y. 2007) (quoting *United States v. Adlman,* 134 F.3d 1194, 1202 (2d Cir. 1998)) (Declining to apply  attorney client privilege to documents including a "draft editorial" and "talking points," and "the related notes and comments" which "seem to have been drafted for public relations purposes," and noting that " '[e]ven if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created 'because of' actual or impending litigation.'")

[19] *See, e.g.*, *Hall & Assocs. v. EPA*, 846 F. Supp. 2d 231, 244 (D.D.C. 2012) (noting that the privilege only applies to the decision-making process).

[20] April 2, 2018 email from Caleb Hayes-Deats

[21] In fact, DHS re-processed three pages from the March 29 production and un-redacted an email for "OIA-LATAM-C" from an email on page 29 of the original production, the names of L. Francis Cissna and Kathy Neubel Kovarik from an email recipient line on page 87 of the original production, the name Brandon Prelogar on email sender and signature lines on another email on page 87, and the email recipient "Immigration Policy" on page 92. These corrections reflect the apparently haphazard manner with which the b(6) exemption has been applied.

The Second Circuit determines when Exemption 6 applies by balancing "an individual's right to privacy against the preservation of FOIA's basic purpose of opening agency action to the light of public scrutiny." *AP v. DOD*, 554 F.3d 274, 291 (2d Cir. 2009). Disclosure of the redacted names is warranted here because the employees' discussions (e.g. creating, reviewing and discussing the announcement of the fate of TPS for Haiti) were not "low level" work, and disclosure would allow the public to understand each agency's contributions to the decision to terminate TPS for Haiti and the nature of the agencies' interaction at the time. The high level of public interest in the reflects in the significant attention paid to documents have already disclosed through this case. *See* 56.1 ¶64. To the extent that the redacted names are of individuals who did not in fact influence the termination, redaction of their names is inappropriate.[22] With respect to actual "line-level" employees, if that characterization does apply to some redacted names, then disclosure of the relevant offices reflects a proper balance between the high public interest in the information and the need to protect the identities of lower level employees.[23]

## CONCLUSION

The privileges Defendants assert are meant to safeguard the integrity of agency processes, not to provide cover for the undisclosed replacement of the standard by which it executes its delegated duties. In the case at hand, the government's changed standard has thrown into chaos the lives of thousands who rely on the propriety of TPS decisions. The transparency that is at the core of FOIA demands the disclosure of these documents.

---

[22] *See Families for Freedom v. United States Customs & Border Prot.,* 797 F. Supp. 2d 375, 399 (S.D.N.Y. 2011) (Finding exemption 6 inapplicable when "plaintiffs seek only names, not phone numbers or other more intrusive categories of personal information" and "[t[here is a substantial public interest in knowing whether the expectations and requirements articulated in the memoranda reflect high-level agency policy." *See* 56.1 ¶64)

[23] *See NDLON,* 811 F. Supp. 2d at 748 (Disclosure of the places of work and titles but not the names of subordinate staff warranted to allow plaintiffs to determine whether documents reflect views of agency versus views of individual staff and thus determine applicability of DPP).

Dated:  New York, New York
       May 18, 2018

                                          Respectfully submitted,


                                          By: /s/ Jessica Rofé               

                                          Nancy Morawetz
                                          Jessica Rofé
                                          Fatima Carrillo Moran, Legal Intern
                                          Nora Searle, Legal Intern
                                          Kevin Siegel, Legal Intern
                                        WASHINGTON SQUARE LEGAL
                                        SERVICES, INC.
                                        245 Sullivan Street, 5th Floor
                                        New York, NY 10012
                                        (212) 992-7245
                                        nancy.morawetz@nyu.edu
                                        jessica.rofe@nyu.edu
                                        *Attorneys for Plaintiffs*